# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-06-00423-CR
NO. 03-06-00424-CR
NO. 03-06-00425-CR

**Charles Sparks, Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT
NOS. D-1-DC-05-904027, D-1-DC-05-904031, & D-1-DC-05-904032
HONORABLE BRENDA KENNEDY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

In three cases consolidated for trial, a jury convicted Charles Sparks of the offenses of sexual assault of a child, aggravated sexual assault of a child, indecency with a child by contact, and indecency with a child by exposure. *See* Tex. Penal Code Ann. § 21.11(a)(1), (2) (West 2003), §§ 22.011(a)(2), 22.021(a)(1)(B) (West Supp. 2007). Each case involved a different victim and contained multiple counts. In cause number D-1-DC-05-904027, punishment was assessed at 68 years' imprisonment for count I (sexual assault of a child), 40 years' imprisonment for count II (indecency with a child by contact), and 30 years' imprisonment for count III (indecency with a child by exposure). In cause number D-1-DC-05-904031, punishment was assessed at life imprisonment for count I (aggravated sexual assault of a child) and 50 years' imprisonment for count III (indecency with a child by exposure) (count II, involving indecency with a child by contact, was not submitted

to the jury). In cause number D-1-DC-05-904032, punishment was assessed at life imprisonment for count I (aggravated sexual assault of a child), 60 years' imprisonment for count II (indecency with a child by contact), and 50 years' imprisonment for count III (indecency with a child by exposure). In eighteen issues on appeal, Sparks challenges the legal and factual sufficiency of the evidence, and contends that the district court abused its discretion in denying his motion to sever the three cases and in removing him from the courtroom during the State's closing argument. We will affirm the judgments of the district court.

## BACKGROUND

The jury heard evidence that, in April 2004, Detective Kathy Hector of the Austin Police Department investigated a report of sexual abuse involving three girls, A.A., C.J., and A.M. The abuse allegedly occurred in 1999 and 2000.

Detective Hector first interviewed Cathy Spence, A.A.'s mother and C.J.'s aunt, who had reported the abuse to the police. Hector next met separately with each victim to take their statements. Camille Haberman, a victim services counselor with the Austin Police Department, testified that she met with the victims prior to their interviews with Hector and explained to the girls the importance of telling the truth. Hector testified that during the interviews, she asked the girls open-ended questions and that "they were very good about being very particular on [the] details" of what happened to them. Hector believed that the language used by the girls was age appropriate, and their stories did not seem rehearsed. Hector added, "The main thing I remember is that they were very shy and they were very straightforward with me." Hector testified that all three victims identified Sparks as the perpetrator. After interviewing the victims, Hector "decided to go ahead

2

with the case." Hector later interviewed Tracy Spence, A.A.'s adult sister, and Margaret Moore, A.M.'s mother, other witnesses to whom the victims had reported the abuse. After completing her investigation, Hector filed three sexual assault charges against Sparks, two of which were aggravated because of the age of two of the victims at the time of the alleged assaults. *See* Tex. Penal Code Ann. § 22.021(a)(1), (2)(B).

Each victim testified at trial, along with several witnesses to whom the victims had reported the abuse. Because Sparks's issues on appeal do not require an extensive discussion of the facts, we shall briefly summarize the relevant testimony.

A.A. testified that when she was approximately 13 years old, she would often visit the home of her aunt, Cathy Spence, and her cousin, C.J. During this time, Sparks, Spence's boyfriend, also lived at the house. A.A. testified that when she would visit, Sparks would sometimes "horseplay" and "wrestle" with her and C.J. The "wrestling" would take place on Spence's bed while Spence was out of the house. Later that same year, A.A. lived with Spence for approximately two weeks. During this time, A.A. explained, Sparks would come into her room at night and touch her sexual body parts with his sexual body parts. A.A. testified that this happened "so many times," "maybe a good three times out of a week," even though she sometimes "made comments for it to stop." On one occasion, according to A.A., the touching escalated into penetration. On another occasion, Sparks "flashed" A.A. while he was in the kitchen and she was walking through the living room. A.A. also testified that there were occasions when Sparks would touch her breasts while she was watching television. The jury also heard testimony from Tracy Spence, to whom A.A. had reported the abuse.

C.J. testified that when she was approximately nine years old, Sparks would sometimes "rassle" or wrestle with her. This activity included what C.J. described as "goosing." When asked to explain what she meant by "goosing," C.J. explained, "He would be on top of me just going up and down," and his "private area" would be rubbing against her "private area." C.J. also recalled an incident when Sparks "would just open my door and flash himself." However, according to C.J., the majority of the incidents happened while she was sleeping. C.J. testified that on occasions when her mother would be out of the house, Sparks would enter C.J.'s bedroom, remove her clothing, and penetrate her. C.J. explained that this "happened frequently, . . . he would stay gone during the day, and he would come when my mom would leave to go to work." When asked how many nights a week this happened, C.J. recalled, "Almost every night." C.J. testified that the abuse stopped in 2001 when Sparks was no longer living at the house.[1] On cross-examination, C.J. testified that she did not know exactly how many times Sparks penetrated her, but she thought it was more than 50 times. The jury also heard testimony from C.J.'s mother, Cathy Spence, to whom C.J. had first reported the abuse, and Dr. Beth Nauert, a pediatrician and medical director of the Child Assessment Program,[2] who interviewed and conducted a physical examination of C.J.

A.M. testified that Sparks lived with her and her mother when she was approximately 12 years old, beginning in 1998 or 1999. A.M. explained that during that time, Sparks would repeatedly touch her breasts and rub up against her while he was "hugging" her. A.M. also testified

---

[1] The jury heard evidence that Sparks went to prison in 2001 on charges unrelated to the sexual abuse allegations.

[2] Dr. Nauert testified that the Child Assessment Program is a clinic that performs medical evaluations for children who are suspected of having been physically or sexually abused.

that in the summer of 2000, when A.M.'s mother was out of town, Sparks penetrated her for the first time. After that incident, A.M. recalled, Sparks penetrated her "probably like two or three times" a week. When asked when this stopped happening, A.M. testified, "Whenever he went to jail [in 2001], that's when it stopped happening." The jury also heard testimony from A.M.'s mother, Margaret Moore, to whom A.M. had reported the abuse.

Following the testimony of the victims and the witnesses to whom they had reported the abuse, the jury heard evidence from psychologist William Carter. Dr. Carter did not have personal knowledge of the facts surrounding these particular cases, but he testified that he had expertise in the dynamics of child sexual abuse, including the outcry process and the characteristics of sexual-abuse perpetrators. Carter testified that "in about 80 percent of cases the perpetrator of abuse is somehow connected to the family and it frequently is a male that's associated with adult females in the family." Carter explained that in these cases it is difficult for a child to come forward with abuse allegations, because the child is concerned about how the mother will react and whether the mother will take the male's side. Therefore, according to Carter, it is "not at all uncommon" for children to wait weeks, months, or even years to report the abuse.

Carter also testified that perpetrators of abuse "select their victims carefully because they want to be successful. They want to control the victim." Carter explained that the abuse will often escalate as the perpetrator becomes increasingly confident that the child will not report the abuse. Additionally, according to Carter, the longer the abuse occurs, the more helpless the victim feels and the more difficult it is for the child to disclose what has happened to her. Carter testified extensively about the characteristics of credible abuse allegations, and he explained how the outcry

5

becomes more credible when the victim provides sensory "core details" about the abuse—i.e., what she felt, what she saw, and what she heard during the incident. During his redirect examination, Carter added that when evaluating abuse allegations, he pays attention not only "to the words that the child says and the details she offers," but also to how eager or reluctant she is to tell, whose idea it was to tell, and whether reporting the abuse makes the child feel "emotionally strained."

After the State rested its case-in-chief, Sparks testified in his defense. Sparks admitted that he had previously been convicted of the offenses of burglary, attempted burglary, and burglary of a habitation. Sparks also admitted to being diagnosed with paranoid schizophrenia, but he claimed that he stopped taking medication for the disorder in 2003. Sparks denied all of the allegations and testified that he "loved all those kids with all of my heart." He claimed that the girls were lying about the abuse. When asked why they were lying, Sparks testified, "Due to my falling out with Cathy Spence and my falling out with Margaret Moore." Sparks asserted that Spence and Moore were "very good friends," despite the fact that he admitted to having sexual relationships with both of them. Sparks alleged that while he was in prison, the women came up with a plan to exact "revenge" on Sparks for breaking up with them. According to Sparks, this plan included manipulating the three girls into telling lies about what Sparks did to them.

On cross-examination, Sparks admitted to a prior sexual relationship with Marie Stroud, a young woman who, according to Sparks, was 22 when she gave birth to his son. The State called Stroud as a rebuttal witness. Stroud testified that she grew up in foster care and had herself been a victim of sexual assault prior to meeting Sparks. Stroud recounted how she met Sparks when she was 16 and he was 36. According to Stroud, Sparks approached her while she was waiting at

6

a bus stop and offered her a ride, which she accepted. Stroud testified that while she was still 16, the two began a sexual relationship that continued until Sparks went to prison in 2001. At age 18, Stroud recalled, she became pregnant with Sparks's son. Stroud further testified that Sparks would talk to her about C.J., and that he made comments about C.J.'s physical appearance and how she looked while she slept. Stroud explained that Sparks's remarks about C.J. "made me concerned because I didn't think he should be looking at her." Stroud added, "And being a victim of sexual assault myself, I didn't think that was appropriate."

With regard to the charges involving A.A., the jury convicted Sparks of sexual assault of a child, indecency with a child by contact, and indecency with a child by exposure. With regard to the charges involving C.J., the jury convicted Sparks of aggravated sexual assault of a child and indecency with a child by exposure. Finally, with regard to the charges involving A.M., the jury convicted Sparks of aggravated sexual assault of a child, indecency with a child by contact, and indecency with a child by exposure. In each of the three indictments, there were five enhancement paragraphs alleging a total of eleven prior felony convictions. The jury found the enhancement allegations to be true. As mentioned earlier, the jury assessed various terms of imprisonment against Sparks, including two life sentences for the aggravated sexual assault charges. This appeal followed.

## DISCUSSION

### Evidentiary sufficiency

In his first through sixteenth issues, Sparks challenges the legal and factual sufficiency of the evidence supporting each count in each case for which he received a conviction. However, Sparks does not separately address each case or each count. Instead, Sparks asserts that

the evidence in its entirety is legally insufficient because "there is only the testimony of the three victims who are testifying to events that happened three to five years before the trial of this case." Similarly, Sparks asserts that the evidence is factually insufficient because "there is only the suspect testimony of the three alleged victims." The testimony of the victims is "suspect," according to Sparks, because of his past romantic relationships with Cathy Spence and Margaret Moore. Sparks asserts that the girls' allegations were "lies brought forth about him as a result of a conspiracy" between Spence and Moore.

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id*. at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id*. at 417.

A person commits the offense of sexual assault of a child if he intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means. Tex. Penal Code Ann. § 22.011(a)(2)(A). A person commits the offense of aggravated sexual assault of a child if he sexually assaults a child younger than 14 years of age. *Id*. § 22.021(a)(1), (2)(B). A person commits the offense of indecency with a child by contact if he engages in sexual contact with the child or causes the child to engage in sexual contact. *Id*. § 21.11(a)(1). A person commits the offense of indecency with a child by exposure if, with intent to arouse or gratify the sexual desire of any person, he exposes his anus or any part of his genitals, knowing the child is present. *Id*. § 21.11(a)(2)(A).

For all of the above offenses, the testimony of the child victim alone is legally sufficient to support a conviction. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (West 2005); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978); *Lee v. State*, 186 S.W.3d 649, 655 (Tex. App.—Dallas 2006, pet. ref'd); *Hellums v. State*, 831 S.W.2d 545, 547 (Tex. App.—Austin

9

1992, no pet.). In this case, all three victims testified that Sparks made sexual contact with them, exposed himself to them, and penetrated them. The jury could have rationally credited their testimony, especially when considering the specific details the girls provided about the abuse, including when it happened, where it happened, and how often it happened. The victims each testified to a similar pattern of behavior. First, according to the girls, Sparks would engage in seemingly harmless behavior—hugging or wrestling with the victims. Then, he would sexually contact the victims and expose himself to them. Finally, the contact and exposure would escalate into penetration. A.A. testified that she was penetrated once, while C.J. and A.M. testified that Sparks repeatedly penetrated them. The victims also provided sensory "core details" about what they saw, heard, and felt during and immediately following the abuse.

As for Sparks's complaint that the victims were testifying to events that occurred "three to five years before trial," Dr. Carter testified that when the perpetrator of the abuse is a male who has a relationship with the victim's mother, it is "not at all uncommon" for children to wait weeks, months, or even years to report the abuse. Based on this testimony, among other evidence, the jury could have rationally disregarded the lapse of time between the abuse and the reporting of the abuse.

Additionally, the jury heard testimony from the witnesses to whom the girls had reported the abuse: Detective Kathy Hector, Tracy Spence, Cathy Spence, Dr. Beth Nauert, and Margaret Moore. The jury could have rationally accepted their testimony. Viewing the above evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient to support the convictions.

10

When considering the evidence in a neutral light, we reach the same conclusion regarding the factual sufficiency of the evidence. At trial, Sparks denied the allegations against him. He claimed that Spence and Moore, seeking "revenge" for what Sparks claimed was his decision to break up with them, had manipulated the girls into lying about the abuse. Sparks re-urges this argument on appeal, essentially asking this Court to find that his testimony is credible, while the testimony of the victims and those who corroborated their testimony is not. However, the jury is the sole judge of the credibility of the witnesses and the weight to be given the evidence, and may choose to believe all, some, or none of it. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Rachal v. State*, 917 S.W.2d 799, 805 (Tex. Crim. App. 1996); *Skillern v. State*, 890 S.W.2d 849, 879 (Tex. App.—Austin 1991, pet. ref'd). Thus, the jury is permitted to believe or disbelieve any part of the testimony of any witness. *Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998). The jury could have rationally chosen to believe the testimony of the victims and disbelieve Sparks's testimony. As explained above, in addition to the victims, multiple witnesses testified for the State. Even were the jury to discount the testimony of Cathy Spence and Moore, the jury would still have the testimony of Tracy Spence, to whom A.A. first reported the abuse, Dr. Beth Nauert, who interviewed and performed a physical exam on C.J., and Detective Kathy Hector, who interviewed all three victims. On the other hand, Sparks's theory of a conspiracy between the victims' mothers finds no support in the evidence other than his testimony alone. The jury could have rationally found that Sparks's theory was contradicted by the testimony of Spence and Moore, both of whom testified that they had a somewhat antagonistic relationship with each other prior to learning about the abuse. According to their testimony, this antagonism resulted from

11

their knowledge that Sparks had been dating both of them at approximately the same time. For this and other reasons, the jury could have accepted Spence and Moore's testimony while rejecting Sparks's testimony.

We overrule Sparks's first through sixteenth issues.

**Motion to sever**

In his seventeenth issue, Sparks contends that the district court abused its discretion in denying his motion to sever the three cases that were filed against him. At some point prior to trial, apparently on the State's motion, the cases were consolidated.[3] On June 9, 2006, Sparks filed a motion to sever, which was denied.[4]

On the morning trial was set to begin, Sparks re-urged his motion to sever, asserting that he was entitled to severance because the three cases did not arise "out of the same criminal episode." Sparks further argued that consolidation would unfairly prejudice his defense because of the possible effect that multiple allegations of sexual misconduct involving three different victims could have on the minds of the jurors. The State responded that consolidation was appropriate because the separate outcries occurred within days of each other, the assaults allegedly occurred within the same year, and two of the victims were living in the same house when they were allegedly assaulted. The State also argued that consolidation promoted "judicial economy" because the cases

---

[3] The State's motion to consolidate is not included in the record.

[4] Although the judge's rulings do not appear in the record, the parties concurred during a pretrial hearing before the district court that the visiting judge granted the motion to consolidate and denied the motion to sever.

12

involved "the same witnesses, the same officers, and the same doctors' testimony." The district court denied the motion to sever.

A defendant may be prosecuted in a single criminal action for all offenses arising out of the same "criminal episode." Tex. Penal Code Ann. § 3.02(a) (West 2003). A "criminal episode" is defined as the commission of two or more offenses if "the offenses are the repeated commission of the same or similar offenses." *Id*. § 3.01(2) (West 2003). As a general rule, if a defendant timely objects to the consolidation of the offenses, he is entitled to severance. *See id*. § 3.04(a) (West Supp. 2007); *Lane v. State*, 174 S.W.3d 376, 380 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). However, the defendant's right to severance does not apply to a prosecution for offenses described by section 3.03(b). *See* Tex. Penal Code Ann. § 3.04(c). Section 3.03(b) includes sexual offenses committed against a victim younger than 17 years of age. *Id*. § 3.03(b)(2) (West Supp. 2007). In such cases, the defendant is not entitled to severance unless the defendant makes a showing that he would be "unfairly prejudiced" by consolidation. *Lane*, 174 S.W.3d at 380. We review the trial court's denial of a defendant's motion for severance for abuse of discretion. *See Salazar v. State*, 127 S.W.3d 355, 365 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

"There is no presumption that the joinder of cases involving aggravated sexual assault against different children is unfairly prejudicial." *Id*. Sparks must explain "how the joinder would cause him unfair prejudice." *See Lane*, 174 S.W.3d at 380. At the hearing before the district court on the motion to sever, Sparks asserted that the jury could not be fair and impartial toward a defendant who had been accused of three sexual assaults. Sparks also claimed that only cases involving a single victim could be consolidated. In his brief, Sparks's argument on this issue is

13

limited to the following statement: "In this proceeding, three clearly weak cases were consolidated to enhance the prejudicial nature of the cases to prejudice the jury against" Sparks. Sparks fails to elaborate on how consolidation of these cases resulted in unfair prejudice, or on how the district court's decision to deny severance rose to the level of an abuse of discretion.

Furthermore, Sparks cites to only a single case in which a trial court's denial of a motion to sever was found to be an abuse of discretion. *See Wheat v. State*, 160 S.W.3d 631, 636-37 (Tex. App.—Waco), *vacated*, 178 S.W.3d 382 (Tex. Crim. App. 2005). In *Wheat*, the defendant was charged with two counts of indecency with a child (each involving a different victim) and one count of sexual assault of a child (involving one of the victims who was also involved with the indecency allegations). 160 S.W.3d at 632. The defendant moved to sever the indecency charges from the sexual assault charge, because he intended to plead guilty to the indecency charges and not guilty to the sexual assault charge. *Id*. at 632-33. The trial court denied the motion for severance. *Id*. at 633. The court of appeals reversed, attributing significance to the defendant's different pleas. *Id*. at 636-37. The court expressed concern that the "defensive theories may change" depending on whether the indecency charges to which the defendant pleaded guilty and the sexual assault charge to which the defendant pleaded not guilty were tried separately or together. *Id*. at 636.

The court also explained that there were different procedural consequences for each plea:

> The bifurcation statute [article 37.07 § 2(a), code of criminal procedure] "is applicable only to pleas of not guilty before a jury." The statute "has no application to a trial before the court on a plea of not guilty." Thus, once a guilty plea has been entered, the trial is not to be bifurcated, but rather a unitary procedure is to be used, regardless of whether the guilty plea is entered before a trial judge or a jury.

14

*Id*. at 635 (internal citations omitted). Therefore, the court held, the defendant was also prejudiced by being subjected to a bifurcated trial for an offense to which he pleaded guilty. *Id*. at 636-37.

In summary, the defendant in *Wheat* satisfied his burden of showing unfair prejudice. The court explained:

> Prior to voir dire and hearing of the pleas, the trial judge was informed that Wheat was seeking a severance because he intended to plead guilty to counts one and three and it would be prejudicial for the jury to hear his guilty pleas along with count two. The trial judge eventually allowed the State to tell the potential jurors that Wheat intended to plead guilty to counts one and three. The trial judge also heard the guilty pleas in front of the jury, which forced Wheat to use an "unusual" defensive theory. Once the trial judge was informed that Wheat intended to plead guilty to counts one and three, he should have conducted unitary proceedings on those two counts. Wheat was unfairly prejudiced on count two by the unauthorized bifurcated trial on the guilty pleas for counts one and three.

*Id*.

In this case, Sparks failed to make a similar showing of unfair prejudice. The record on this issue consists of the district court's pretrial hearing on Sparks's motion to sever, and the trial itself. The record does not include any proceedings before the visiting judge. The record reflects that at the hearing before the district court, Sparks requested severance of the cases by victim. The record also reflects that at trial, Sparks pleaded not guilty to all of the charges against him, and that his defensive theory against each victim's allegations was the same—he denied the allegations in their entirety and claimed that each victim was lying as a result of manipulation by Spence and Moore. The record does not reflect that, prior to consolidation, Sparks intended to plead guilty to the allegations by one of the victims but not guilty to the allegations by the other victims. Nor does the record reflect that, had the cases been severed, Sparks would have asserted different defensive

15

theories for each victim. On this record, there is no basis for us to conclude that Sparks was unfairly prejudiced by consolidation.

Additionally, even if the district court had granted Sparks's motion to sever, it is likely that the evidence relating to all three victims would have been admitted in each trial. Although evidence of other crimes is not admissible to prove the character of a person to show he acted in conformity therewith, it may be admissible for other purposes. *See* Tex. R. Evid. 404(b). One such purpose is rebutting a defensive theory. *See Matthews v. State*, 152 S.W.3d 723, 731 (Tex. App.—Tyler 2004, no pet.); *Salazar*, 127 S.W.3d at 365. Sparks's defensive theory was that each victim was lying. Similar allegations by other victims would rebut that theory. Therefore, even had the cases been tried separately, "it is probable that the testimony of the other victims would have been admissible to refute the defensive theory that each complainant, for whatever reason, concocted the story." *Matthews*, 152 S.W.3d at 731. Furthermore, because of the allegedly similar patterns of abuse in each case, and because two of the victims were living together, it is also likely that the testimony of the other victims would have been admissible to show opportunity, intent, preparation, or plan. *See* Tex. R. Evid. 404(b). For these reasons, we conclude that the district court did not abuse its discretion in denying Sparks's motion to sever.

We overrule Sparks's seventeenth issue.

**Sparks's removal from the courtroom**

In Sparks's eighteenth issue, he asserts that the district court denied him "due process of law and due course of law" by removing him from the courtroom during the State's closing

argument.[5]  We review a trial court's decision to remove a defendant from the courtroom for abuse of discretion.  *See Kessel v. State*, 161 S.W.3d 40, 47 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).  As the Supreme Court has explained,

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country.  The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated.  We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.  No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations.  We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant . . . : (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly.

*Illinois v. Allen*, 397 U.S. 337, 344-45 (1970).

Sparks's removal from the courtroom occurred immediately after the following outburst directed at the prosecutor during her closing argument:

| The Defendant: | Tell them about this DNA that I passed.  That's what you do. |
| The Court: | You're going to have to be—you're going to have to be quiet, sir. |
| The Defendant: | Did the DNA on [A.M.], and it came back negative.  Tell them. |

---

[5]  The State asserts that Sparks failed to preserve error on this issue by not objecting to his removal at the time it occurred.  However, because a defendant's right to be present in the courtroom "must be implemented by the judicial system unless expressly waived," it "is not subject to ordinary preservation-of-error rules."  *See Kessel v. State*, 161 S.W.3d 40, 45 n.1 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd).  Because it does not appear from the record that Sparks expressly waived his right to be present in the courtroom, we shall consider this issue.

17

| | |
|---|---|
| The Court: | Will you have him removed? |
| The Defendant: | You paid Marie Stroud to come and lie. |
| The Court: | Remove him from the courtroom, please. |
| The Defendant: | You tried to get my wife to come and lie. |
| | You want to hit me.  I don't care. |
| | You lying.  You know what you are doing. |

(Defendant out)

The record does not reflect when Sparks returned to the courtroom.  However, Sparks was present when the district court later read a note from the jury during the jury's deliberations.

Sparks contends that, rather than removing him from the courtroom, the district court should have provided him with "a strong admonishment . . . or some other action short of his removal from the courtroom."  However, the record reflects that the district court had already, on multiple occasions, admonished Sparks about his courtroom behavior.  First, prior to Dr. Nauert's testimony, Sparks was conferring with counsel when the district court admonished Sparks, "Excuse me, excuse me.  You need to lower your voice."

The next incident occurred during a voir dire examination of A.M. outside the presence of the jury.  After A.M. answered a question, Sparks interjected, "Not true."  A few moments later, the following exchange occurred:

| | |
|---|---|
| The Defendant: | Your Honor, may I say something? |
| The Court: | No. |

18

(Counsel and defendant conferring)

| | |
|---|---|
| The Defendant [to A.M.]: | You always remember God don't like—you got to pay for them lies. |
| The Witness [A.M.]: | You got to pay for yours, too. |
| Deputy Sheriff: | Can you give us a minute, Judge? |
| The Court: | Yeah. . . . |
| The Defendant: | Pay for them lies. You made them up, you got to pay for them. You'll probably all go straight to hell. |

Sparks was then briefly removed from the courtroom. When the jury returned, defense counsel objected to Sparks's absence, and Sparks was returned to the courtroom prior to the resumption of A.M.'s cross-examination.

Sparks continued his disruptive behavior during his cross-examination. Following a question by the State about Sparks's theory that A.A. was manipulated by Spence, Sparks claimed that he had letters to prove that A.A. was lying about the sexual abuse allegations. The State objected that Sparks was being non-responsive, and while the district court was considering the objection, Sparks told the district court, "Let me introduce my letters, and I guarantee you, I can walk out of here." The State repeated its objection, and the district court admonished Sparks to "refrain from referring to things that aren't in evidence." Sparks replied, "But, Judge, first of all, she led the witness." The district court admonished Sparks, "Excuse me. I'm not having a discussion with you. I'm telling you." Sparks then continued answering the State's questions in a manner that the State characterized as non-responsive, and the district court told Sparks, "You need to be quiet and answer the questions." However, Sparks continued arguing with the prosecutor and referring to the alleged

19

letters and "lies." The district court again told Sparks, "You need to be quiet." Sparks then addressed the prosecutor, telling her, "You led every witness in here." After this remark, the district court admonished Sparks that further outbursts would not be tolerated: "Mr. Sparks. Mr. Sparks, you will just have to answer the question that you are asked. And if you continue to have outbursts, you'll be removed from the courtroom."

Thus, the record reflects that prior to Sparks's removal from the courtroom during the State's closing argument, the district court had already repeatedly admonished Sparks to behave. Despite these numerous warnings, Sparks persisted in his disruptive behavior. Prior to removing him, the district court provided Sparks with one final warning. It went unheeded. Therefore, we conclude that the district court did not abuse its discretion in temporarily removing Sparks from the courtroom.

We overrule Sparks's eighteenth issue.

## CONCLUSION

Having overruled Sparks's issues on appeal, we affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: April 17, 2008

Do Not Publish

20