**AFFIRM; and Opinion Filed August 4, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00176-CR

### NICKEY VAN EXEL A/K/A NICKEY VANEXEL, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the 363rd Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. F-11-00424-W

## OPINION

Before Justices FitzGerald, Fillmore, and Evans
Opinion by Justice FitzGerald

A jury found appellant Nickey Van Exel, a/k/a Nickey Vanexel,[1] guilty of murder and assessed punishment of sixty years' imprisonment and a $10,000 fine. The trial judge rendered judgment on the jury's verdict. Appellant raises four issues on appeal. We affirm.

## I. BACKGROUND

In July 2011, the State indicted appellant for capital murder, alleging that he shot and killed Bradley Eyo in the course of committing the offense of retaliation. The State's theory of the case was that Eyo had been charged with robbery in Houston, and that appellant killed Eyo to keep Eyo from identifying him as an accomplice. Evidence at trial showed that Eyo and

---

[1] The judgment of conviction recites appellant's name as "Nickey Vanexel." The notice of appeal and appellate briefs refer to him as "Nickey Van Exel."

appellant were friends and had jointly committed multiple armed robberies in Houston in May 2010. Eyo was charged with aggravated robbery but appellant was not. Eyo told appellant that he was going to follow his attorney's advice, make an open plea to the judge, and admit everything about the robberies, including appellant's role in them. A few weeks later, Eyo's body was found in a Dallas park. He had been killed by a gunshot. About two days after Eyo's death, appellant voluntarily went to the police and admitted that he had shot Eyo, but he said it was an accident.

The jury charge allowed the jury to find appellant guilty of capital murder, murder, manslaughter, or criminally negligent homicide. The jury found appellant guilty of murder.

## II. ANALYSIS

Appellant raises four issues on appeal. First, he challenges the sufficiency of the evidence to convict him. Second, he contends that the trial judge erred by admitting hearsay testimony against him. Third, he complains that the trial judge erred by holding an in camera hearing in appellant's absence. And fourth, he complains that the State made an improper closing argument.

### A. Sufficiency of the evidence

We first address appellant's issue challenging the sufficiency of the evidence to convict him of murder. Under the appropriate standard of review, we consider all of the evidence in the light most favorable to the jury's verdict and determine whether a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt, based on the evidence and the reasonable inferences therefrom.[2] We must defer to the jury's credibility and weight determinations because the jury is the sole judge of the credibility of the witnesses and the

---

[2] *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

weight to be given to their testimony.[3]  It is not necessary for every fact to point directly and independently to appellant's guilt for us to uphold the conviction; the evidence is sufficient if the finding of guilt is warranted by the cumulative force of all the incriminating evidence.[4]

A person commits murder if he intentionally or knowingly causes the death of an individual.[5]  A person acts intentionally with respect to the result of his conduct when it is his conscious objective or desire to cause the result.[6]  A person acts knowingly with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.[7]  Direct evidence of the defendant's mental state is not required,[8] and proof of the defendant's mental state almost always depends on circumstantial evidence.[9]  Intent and knowledge can be inferred from the acts, words, and conduct of the accused.[10]  Appellant limits his sufficiency-of-the-evidence challenge to the element of culpability, contending that there was insufficient evidence to prove that his conduct resulting in Eyo's death was more than reckless, at worst.

### 1.      Review of the evidence

At the time of Eyo's death in December 2010, he was 23 years old and appellant was about 19 or 20.  Appellant and Eyo had lived across the street from each other while they were growing up, and they were very close friends.  After high school, Eyo moved to Houston for college, but he and appellant remained very close.  In May 2010, Eyo and appellant were arrested in Houston as suspects in an armed robbery.  The investigation of that crime led to

---

[3] *Id.*

[4] *Id.*

[5] TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

[6] *Id.* § 6.03(a).

[7] *Id.* § 6.03(b).

[8] *Young v. State*, 358 S.W.3d 790, 802 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

[9] *Lincoln v. State*, 307 S.W.3d 921, 924 (Tex. App.—Dallas 2010, no pet.).

[10] *Martinez v. State*, 833 S.W.2d 188, 196 (Tex. App.—Dallas 1992, pet. ref'd).

evidence that implicated Eyo and appellant in two other armed robberies that had occurred that same night. Ultimately, the Harris County District Attorney pressed one aggravated-robbery charge against Eyo and decided not to prosecute appellant.

An attorney named Allan Tanner represented Eyo in the Harris County robbery case, and he testified to the following facts at appellant's trial. Eyo wanted to plead guilty to the armed-robbery charge. During Eyo's consultations with Tanner, Eyo refused to say anything about appellant's involvement in the robberies. Tanner advised Eyo that he would have to be honest and forthcoming with the judge at the sentencing hearing if he wanted to receive a light sentence. Tanner also advised Eyo that appellant would never be charged with the armed robberies even if Eyo admitted appellant's involvement during the sentencing hearing. Tanner told Eyo that his word alone was insufficient to justify charging appellant without corroborating evidence, and he also told Eyo that the normal practice of the Harris County District Attorney was not to follow up on information divulged at sentencing. Eyo pleaded guilty on November 16, 2010, and his sentencing hearing was scheduled for January 6, 2011.

Eyo's cousin Joseph Ene-Ita also testified at appellant's trial, and he testified to the following facts. He was a year older than Eyo. He and Eyo were close, and he was also a close friend of appellant. Ene-Ita was living in Houston in 2010, and Eyo sought his advice on how to handle the armed-robbery charge arising from the May 2010 robberies. In November 2010, Ene-Ita listened on speakerphone to a telephone conversation between Eyo and his lawyer, Tanner. As soon as that conversation was over, Eyo called appellant, and Ene-Ita again listened to the conversation on speakerphone. When Ene-Ita began testifying about what was said during that conversation, appellant made a hearsay objection, which the judge overruled. The judge granted appellant's request for a running objection. Ene-Ita then testified that Eyo told appellant about Eyo's conversation with Tanner and told appellant that Eyo was going to go to court and "tell

everybody's role of what happened in the robberies so he could get probation." Appellant's response was silence. Ene-Ita then grabbed the phone and started talking to appellant because he "felt tension." He assured appellant that Eyo's confession "wasn't going to get him in any trouble" and it was just for Eyo "to get on probation and stipulations for probation." Ene-Ita then testified about appellant's reaction to Ene-Ita's assurances:

Q.     And what was his reaction to your explaining all this to him?

A.     He just said, all right.

Q.     And when you say he said, all right, did he sound all right?

A.     Not really.

Q.     How did he sound?

A.     Sounded like—sounded like it wasn't right. He was confused about what was going on, like confusion.

Q.     Did he ever indicate that he was okay with Bradley [Eyo] doing this?

A.     No, he didn't.

After that telephone conversation, Eyo told Ene-Ita that Eyo was going to talk about the roles of the parties in the robberies at the January 6 hearing.

Eyo's brother Antigha Eyo testified to the following facts at trial. Like Eyo, Antigha[11] was attending college in Houston in December 2010. On December 24, 2010, Antigha and Eyo took a bus from Houston to Dallas, arriving in Dallas around midnight. After they arrived in Dallas, Eyo posted a message on the internet website Facebook that said, "Even #JesusChrist disciples turned coat… So with dat in mind the unexpected is expected, just a matter of time." Antigha asked Eyo what that meant, and, as Antigha testified, "[h]e said he felt the need that it related to him so he just—because on Facebook it says what's on your mind so he just put that, because I guess that was on his mind." Antigha also testified that there was a television special

_____

[11] We will use this witness's first name to distinguish him from the decedent.

"on how Judas betrayed Jesus" playing in the bus station when they arrived in Dallas, before Eyo posted the message on Facebook.

After Eyo and Antigha arrived in Dallas, they went to the house where appellant lived, which was right across the street from Eyo and Antigha's father's house. They played video games and listened to music at appellant's house until the sun came up. Antigha testified that appellant acted "kind of antsy like" and wouldn't sit still the whole time Eyo and Antigha were there. When asked if this behavior was unusual for appellant, Antigha testified, "Yeah, to me, but it was regular old Nick to me like. I didn't think nothing of it because I known him so long." He also testified that "everything was cool" between appellant and Eyo when Antigha and Eyo left and went back to their father's house. After sleeping at their father's house for a while, Antigha and Eyo went to their mother's house for Christmas dinner. Eventually, Eyo left their mother's house and went back to their father's house.

Eyo's father, Oyo Eyo, testified to the following facts. The night of December 25, Oyo[12] drove over to the home of Eyo's mother, picked Eyo up, and took him back to Oyo's house. This was around midnight. Shortly after they arrived at Oyo's house, Eyo told Oyo that he wanted to go out and go to a club. He asked Oyo to use the car, and Oyo said no. Oyo went to the restroom and walked into his own room. The next thing he knew, Eyo was gone. That was the last time he saw his son alive. Oyo also testified that Eyo was wearing a watch that evening, and that he had $500 in his pocket.

Officer Drew Jeffcoat of the Dallas County Sheriff's Department testified to the following facts. He was on routine patrol the morning of December 26, 2010. Between 7 and 9 a.m. that morning, Jeffcoat visited Barnes Bridge Park and saw a body lying on the ground near the entrance to the park. He called for an ambulance and approached the body. He saw that the

---

[12] Again, we will use this witness's first name to distinguish him from the decedent.

person had suffered "a large defect in the upper left chest," but there did not appear to be much blood in the area. The person's shoes were missing, but his socks were clean, which suggested that the body had been dumped there. Dallas Police Officer Michael Gonzalez testified that he investigated the crime scene and found no wallet, jewelry, or identification on the body.

Oyo testified that the authorities notified Eyo's family that he was dead on December 27. Early that afternoon, appellant went to Oyo's house and spoke to Oyo. He told Oyo not to worry and that he would look for Eyo's killer. Appellant seemed normal to Oyo at the time. Oyo talked to appellant again later that day and asked him when he had last talked to Eyo. Appellant said he had talked to Eyo on the phone "last night," apparently meaning the night of December 25–26, and that they had had only a short conversation about where appellant was and what he was doing. Antigha testified that he also talked to appellant on December 27, and that appellant was acting "real antsy." Antigha also testified that appellant invited him to go to the mall and take his mind "off a few things," but Antigha did not go. Detective Fidel Perez of the Dallas Police Department testified that he looked for appellant on December 28 to interview him as a possible witness. No one was home, so he left his business card there. Detective Perez also left a voicemail for appellant's father. A couple of hours later, Perez received a call from appellant's defense attorney, who told Perez that someone wanted to talk to him. Perez told him that he would be in the office the next day.

On December 29, appellant, his mother, and his attorney went to Dallas Police headquarters. Appellant and his attorney met with Perez in an interrogation room, and, at the suggestion of appellant's attorney, Perez gave appellant a *Miranda*[13] warning. Perez's interview with appellant was video recorded, and the recording was admitted into evidence. During the interview, appellant gave the following account. The night of December 25–26, Eyo went to

---

[13] *Miranda v. Arizona*, 384 U.S. 436 (1966).

appellant's house at around midnight. Appellant's parents were out of town, and no one else was in the house. While they were hanging out in appellant's room, appellant retrieved a shotgun from his father's closet to show Eyo. Appellant said that the shotgun was never loaded and that he played with it all the time. He gave it to Eyo, and Eyo gave it back to him. Eyo was sitting on a bed, and appellant was standing up holding the gun not too far from Eyo. Appellant pulled the trigger, and Eyo put his hands on his upper chest and said, "You killed me!" Appellant said that he "lost it" after that, and that Eyo was his best friend. Eyo's eyes rolled back and he fell backwards. Appellant began crying and panicking. He called his parents and his stepfather but no one answered. He wrapped Eyo's body in trash bags and put it in his mother's Suburban. He took the body to Barnes Bridge, which was close to the house, and left the body there. He said he did not remove anything from the body. Then he went home and cleaned up the blood with bleach. The next morning, appellant called a friend and asked him for a ride. The friend sent someone to pick appellant up. When the person arrived, appellant put the gun in a bag and asked the person to take him to north Dallas. Appellant had the driver drop him off on Forest Lane, and he went to a creek behind a nearby restaurant. He took the gun out of the bag and threw it into the water. Appellant was visibly upset during the interview and started crying after he had told the story. Perez testified that he found appellant's account of his actions after he shot Eyo very suspicious, but he also testified that, at the time of the interview, he believed that what appellant had told him was accurate.

After appellant's interview, he showed two detectives where he had thrown the gun, but the gun was not found in subsequent searches. That same afternoon, appellant's mother consented to a search of the house where the shooting had occurred. Detective Seth Rosenberg testified that he conducted the search but did not find much evidence. He found a few drops of a substance that could have been blood on the stairs and a possible bloodstain on the wall of the

stairway.  He also found possible bloodstains in the back of a Suburban that appellant's mother furnished for him to search.  And he found a shotgun in appellant's room, but it was not the same caliber as the one that had killed Eyo.

Detective Perez testified that, after his interview with appellant, he arrested appellant for capital murder on the theory that he had killed Eyo during the course of a robbery.  He later changed the charges against appellant to manslaughter, tampering with a human corpse, and tampering with physical evidence.  Later, the charge was increased from manslaughter to capital murder.

The doctor who performed the autopsy on Eyo testified that Eyo was about two to four feet from the end of a shotgun when he was shot, and that he could not have survived the wound even if he had been rushed to an emergency room.

### 2.    Sufficiency analysis

There is no question that the evidence was sufficient to establish that appellant caused Eyo's death.  The video recording of appellant's confession was admitted into evidence, and during that confession he admitted that he pointed a shotgun at Eyo and pulled the trigger, that the shotgun discharged, and that the blast struck Eyo in the chest and killed him.  The question presented is the sufficiency of the evidence that appellant intentionally or knowingly caused Eyo's death.

As previously noted, the mental state of the accused may be proved by circumstantial evidence,[14] and intent and knowledge can be inferred from the acts, words, and conduct of the accused.[15]  The jury is entitled to consider events that occurred before, during, and after the

---

[14] *Lincoln*, 307 S.W.3d at 924.

[15] *Martinez*, 833 S.W.2d at 196.

offense.[16] "In a murder prosecution, the intent to kill may be inferred from the defendant's use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death could not result."[17] Moreover, attempts to conceal incriminating evidence and implausible explanations to the police are probative of wrongful conduct and are also circumstantial evidence of guilt.[18] A motive can be a significant circumstance tending to show guilt,[19] but the State is not required to prove motive in a murder prosecution.[20]

Appellant identifies evidence that tends to support his contention that he did not intentionally or knowingly kill Eyo. For example, the evidence showed that Eyo and appellant were very close friends, and there was evidence that appellant was told he would not get into trouble if Eyo implicated him in the Houston robberies. Although Antigha testified that appellant was acting "antsy" shortly before the shooting, he also testified that he didn't think anything of it because he had known appellant so long. Appellant argues that his upset demeanor during his video-recorded interview tends to show that he was telling the truth that the shooting was an accident. Detective Perez testified that appellant's acts after the shooting could be viewed as the confused actions of a teenager and could be as consistent with accidental death as with ill will or ill motive.

Although the evidence cited by appellant could be viewed as exculpatory, it was the jury's prerogative to weigh all the evidence and choose between conflicting theories of the

---

[16] *Pitonyak v. State*, 253 S.W.3d 834, 844 (Tex. App.—Austin 2008, pet. ref'd).

[17] *Id.*; *see also Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) ("It is both a common-sense inference and an appellate presumption . . . that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill."); *Johnson v. State*, 959 S.W.2d 284, 288 (Tex. App.—Dallas 1997, pet. ref'd) ("We may infer the intent to kill from the use of a deadly weapon in a deadly manner.") (footnote omitted).

[18] *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014).

[19] *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

[20] *Pitonyak*, 253 S.W.3d at 844.

case.[21] Our task is limited to ascertaining whether a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the jury's verdict. Under that standard, we conclude the evidence was sufficient. In his videotaped confession, appellant demonstrated that he pointed a shotgun directly at Eyo from close range and pulled the trigger. Although he also said that he played with the gun all the time and that the gun was never loaded, Antigha testified that he and appellant had never played with guns when they were hanging out at appellant's house. The jury was entitled to judge appellant's credibility and disbelieve his assertion that the gun was never loaded.[22] Thus, the evidence that appellant pointed a gun at Eyo at very close range and pulled the trigger is probative evidence that he acted intentionally or knowingly. The evidence that he moved the body and disposed of the shotgun immediately after the killing is also probative evidence of guilt.[23] The State also put on some evidence of a potential motive in the form of testimony that at the time of the shooting, appellant knew that Eyo was soon going to appear in court and identify appellant as an accomplice to a prior robbery. There was also evidence that appellant acted "antsy" around Eyo and his brother roughly twenty-four hours before the shooting took place.

Appellant also argues that appellate courts have upheld manslaughter convictions in situations involving the accidental discharge of a firearm.[24] But these cases do not support the proposition that the jury in this case was required to believe appellant's statement that he

---

[21] *See Merritt v. State*, 368 S.W.3d 516, 527 (Tex. Crim. App. 2012).

[22] *See Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005) ("[T]he jury was free to take all of the evidence into account and to believe or disbelieve any portion of appellant's statements.").

[23] *See Ex parte Weinstein*, 421 S.W.3d at 668.

[24] *See, e.g.*, *Davis v. State*, 757 S.W.2d 386 (Tex. App.—Dallas 1988, no writ).

believed the shotgun was unloaded when he pulled the trigger. Appellant's cases are simply not relevant to the question before us.

We reject appellant's first issue on appeal.

## B. Admission of evidence

In his second issue on appeal, appellant argues that the trial judge erred by admitting testimony by the victim Eyo's cousin Joseph Ene-Ita about a telephone conversation involving appellant, Eyo, and Ene-Ita. Appellant contends the testimony was inadmissible hearsay with respect to appellant's statements during the conversation. Our standard of review is abuse of discretion.[25] We must uphold the trial judge's ruling if it is correct under any theory of law applicable to the case based on the record before the trial judge.[26]

We have already described Ene-Ita's testimony about the conversation in detail in our discussion of appellant's first issue on appeal, so a short summary will suffice. In November 2010, Eyo called appellant on his cellphone in Ene-Ita's presence. He used the speakerphone function, so Ene-Ita heard the whole conversation. Eyo told appellant that he was going to admit the details of the May 2010 armed robberies in court in hopes of getting probation. Appellant's response was silence. Ene-Ita "felt tension" and told appellant that Eyo's admissions would not get appellant in trouble, and that Eyo was just doing it to get probation. Appellant responded, "all right," but Ene-Ita thought appellant did not sound all right. Ene-Ita thought appellant sounded confused. On appeal, appellant complains specifically about the admission of Ene-Ita's testimony, over appellant's running hearsay objection, concerning appellant's initial period of silence and his subsequent response "all right."

---

[25] *See Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

[26] *See Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).

Appellant spends most of his argument on the proposition that the evidence was not properly admissible under the doctrine of forfeiture by wrongdoing. But he fails to establish the first step of his argument, which is that Ene-Ita's testimony about appellant's part of the conversation actually constituted hearsay. Hearsay is a statement, other than one made by the declarant while testifying, offered in evidence to prove the truth of the matter asserted.[27] A statement is a verbal expression or nonverbal conduct intended as a substitute for verbal expression.[28] Even if a statement meets the definition of hearsay, it is not hearsay if it is offered against a party and is the party's own statement in either an individual or representative capacity.[29] Hearsay is generally inadmissible.[30]

Assuming that appellant's silence and his subsequent comment "all right" met the general definition of hearsay, they still were not hearsay because they were appellant's own statements and were therefore admissions by a party.[31] "Rule 801(e)(2)(A) plainly and unequivocally states that a criminal defendant's own statements, when being offered against him, are not hearsay."[32] There is no requirement that the statement be contrary to the party's interests when it was made; "in order to be admissible, the admission need only be offered as evidence against the party."[33] Because the statements were made by appellant and were offered against him, they were not hearsay. The trial judge did not abuse her discretion by admitting the evidence. Appellant's second issue is without merit.

---

[27] TEX. R. EVID. 801(d).

[28] TEX. R. EVID. 801(a).

[29] TEX. R. EVID. 801(e)(2)(A).

[30] *See* TEX. R. EVID. 802.

[31] *See* TEX. R. EVID. 801(e)(2)(A).

[32] *Trevino v. State*, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999).

[33] *Id.*

## C.     Appellant's absence from an in camera hearing

In his third issue on appeal, appellant argues that the trial judge committed reversible error during trial by conducting a hearing in the judge's chambers when appellant was not present.  Appellant argues that this hearing violated his statutory right to be present under article 33.03 of the code of criminal procedure, his rights under the confrontation clauses of the federal and Texas constitutions, and the Due Process Clause of the United States Constitution.  We conclude appellant's third issue is without merit because any error was harmless.

### 1.     Relevant facts

The relevant facts are these.  The jury was sworn and the first witnesses were called on January 29, 2013.  After two witnesses had testified for the State, the judge sent the jury out for a break at 10:18 a.m.  During that recess, the judge called the lawyers back to her chambers for a hearing on the record.  Appellant was not present in chambers for the hearing.  The record is silent as to whether appellant knew that the hearing was taking place, or whether he knowingly and voluntarily absented himself from the hearing.  Appellant's counsel did not object to appellant's absence from the hearing.

The hearing concerned a juror who had informed the bailiff that she had recognized someone in the gallery observing the trial.  The juror was brought into chambers for the hearing, and an attorney for the State asked her a few questions.  The juror said that the person in the gallery was one of her co-workers but was not someone she socialized with outside of work.  However, if the juror and her co-worker happened to be in the same place where there were two seats at a table, they might sit together.  The juror did not know why her co-worker was there, but she assumed she was there for appellant.  The State asked the juror if that would have any effect on her as a juror, and she replied, "Absolutely not."  Appellant's counsel did not ask the juror any questions, neither side requested her removal from the jury or any other relief, and the

–14–

hearing ended. The person whom the juror identified as a co-worker eventually testified on appellant's behalf during the punishment phase of the case. She testified that she had known appellant for twelve years and that appellant was like a son to her. She testified that appellant was a good young man with potential who got good grades in school. And she testified that if appellant were released, she would be there to help support him and get him back into the community.

### 2. Applicable law

The code of criminal procedure provides:

> In all prosecutions for felonies, the defendant must be personally present at the trial . . . provided, however, that in all cases, when the defendant voluntarily absents himself after pleading to the indictment or information, or after the jury has been selected when trial is before a jury, the trial may proceed to its conclusion.[34]

The confrontation clauses of the federal and state constitutions also guarantee a defendant's right to be present at all stages of the trial when his absence might frustrate the fairness of the proceedings.[35] Finally, appellant also had a due-process right to be present at all times when his presence had a reasonably substantial relationship to the opportunity to defend against the charge.[36] All of these rights, constitutional and statutory, involve essentially the same analysis.[37]

Violations of the right to be present are subject to harmless-error analysis.[38] We consider a constitutional error harmful unless we conclude beyond a reasonable doubt that the error did

---

[34] TEX. CODE CRIM. PROC. ANN. art. 33.03 (West 2006).

[35] *Sumrell v. State*, 326 S.W.3d 621, 623 (Tex. App.—Dallas 2009) (relying on the Sixth Amendment to the United States Constitution and article I, section 10, of the Texas Constitution), *pet. dism'd as improvidently granted*, 320 S.W.3d 338 (Tex. Crim. App. 2010) (per curiam); *see also Kessel v. State*, 161 S.W.3d 40, 45 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("One of the most basic rights guaranteed by the Confrontation Clause is the defendant's right to be present in the courtroom at every stage of his trial.").

[36] *See United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam); *Adanandus v. State*, 866 S.W.2d 210, 219 (Tex. Crim. App. 1993).

[37] *Hernandez-Sandoval v. State*, No. 07-11-00085-CR, 2012 WL 3870306, at *10 (Tex. App.—Amarillo Sept. 6, 2012, pet. ref'd) (mem. op., not designated for publication).

[38] *Routier v. State*, 112 S.W.3d 554, 577 (Tex. Crim. App. 2003).

–15–

not contribute to the conviction or punishment.[39]  Nonconstitutional error is harmful only if it affected the defendant's substantial rights.[40]

### 3.  Application of the law to the facts

Assuming without deciding that error was preserved and that appellant had a right to be present at the in camera hearing with the juror, we conclude that any error was harmless beyond a reasonable doubt.

Appellant argues that his absence from the hearing was harmful to his defense because he could have assisted his attorney by listening to what the juror said, observing her demeanor, and suggesting additional questions to ask the juror.  This is speculation, and there is nothing in the record to support the notion that appellant's presence at the hearing would have changed the course of the hearing or its outcome, much less the outcome of either phase of appellant's trial. The only theory of harm that is suggested by the record is that the juror could have been biased against appellant because of her feelings towards her co-worker who eventually testified for appellant during the punishment phase.  But there is no evidence of such bias, and the only evidence in the record indicates the juror held no such bias.  Through questioning, the State established that the juror's relationship with her co-worker was minimal.  To the extent they had a relationship, it was cordial to the point that they might sit down at a table together if they happened to find themselves in the same place at the same time.  Then the State asked the juror directly whether her familiarity with her co-worker would have any effect on her, and she replied, "Absolutely not."

Appellant's counsel, who was present through the hearing, decided not to ask the juror any questions and did not object to her continued service, demonstrating that he was satisfied

---

[39] Tex. R. App. P. 44.2(a).

[40] Tex. R. App. P. 44(b).

that the juror was not biased against her co-worker or against appellant. Appellant adduced no evidence, such as through a motion for new trial, that he had special knowledge about the juror or her co-worker that could have changed the course of proceedings in any way.[41] In short, the record is devoid of any evidence of juror bias, and the evidence it does contain refutes the existence of juror bias. We conclude that appellant's absence from the in camera hearing was harmless beyond a reasonable doubt. It necessarily follows that any error also did not affect appellant's substantial rights.

We reject appellant's third issue on appeal.

**D.    Closing argument**

In his fourth issue, appellant argues that we should reverse his conviction because the State made an improper closing argument. Permissible jury argument generally falls into one of four areas: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to the arguments of opposing counsel, and (4) a plea for law enforcement.[42] Appellant argues that the State made an improper closing argument when discussing Ene-Ita's testimony about the telephone conversation involving Bradley Eyo, appellant, and Joseph Ene-Ita:

| The State: | Joseph didn't think it was a good idea, but Bradley called him [appellant]. Why didn't Joseph think it was a good idea to call and tell Nickey Van Exel, his best friend, that he was going to snitch on him, that he was going to testify at that hearing? Why, if it wasn't a big deal? Well, *because of cases like this* and because of what -- |
|---|---|
| Defense counsel: | Judge, there's no testimony of that. It's completely outside of the record. |
| The Court: | Sustained. |
| Defense counsel: | Ask the jury be instructed to disregard the last comment. |

---

[41] *See Routier*, 112 S.W.3d at 579 (concluding that defendant's absence from hearing was harmless beyond a reasonable doubt because there were no "specific facts that she could have pointed out to the trial court that her attorneys could not have").

[42] *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010).

The Court:          Overruled.

(Emphasis added.)  Appellant argues that the italicized passage was improper because there was no evidence that Ene-Ita was concerned that appellant might retaliate against Eyo if Eyo testified to appellant's involvement in the May 2010 armed robberies.

We reject appellant's contention and conclude that the argument in question was a permissible deduction from the evidence.  In context, the State's reference to "cases like this" plainly meant cases of retaliation, since that was State's theory of the case.  Ene-Ita testified that after Eyo told appellant about Eyo's intention to admit the details of the May 2010 armed robberies in order to try to get probation, and after Ene-Ita explained to appellant that Eyo's admissions would not get appellant in trouble, appellant "sounded like it wasn't right.  He was confused about what was going on, like confusion."  During his testimony, Ene-Ita was asked how people in his circle felt about "snitching," and he answered, "Not too good about it."  From this testimony, a person could reasonably infer that Ene-Ita thought it was a bad idea for Eyo to tell appellant about Eyo's plan to admit all the details about the robberies because that could be perceived as "snitching" and might lead to retaliation against Eyo.  It was proper for the State to ask the jury to draw those inferences.

Moreover, even if the argument were improper, we would conclude that it was harmless.  Nonconstitutional error is harmless unless it affected the defendant's substantial rights.[43]  If a jury argument is improper because it interjects facts not supported by the record, the error is harmless unless the argument is extreme or manifestly improper in light of the record as a whole.[44]  We consider factors such as the severity of the prejudice caused by the State's improper argument, any measures taken to cure the misconduct, and the strength of the evidence

---

[43] *See* TEX. R. APP. P. 44.2(b).

[44] *See Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008).

supporting the conviction.[45]   In this case, we conclude that the argument did not cause severe prejudice to appellant.  It was a brief comment in the context of the argument as a whole and was not especially inflammatory in nature.  Although the trial judge did not give the jury a curative instruction to disregard, there was ample evidence to support appellant's conviction for murder. He admitted that he pointed a gun at Eyo and pulled the trigger, he did not call for emergency help, he attempted to conceal his role in the killing, and he did not immediately come forward to admit his role in Eyo's death.  We conclude that the argument, if improper, was not extreme or manifestly improper in light of the record as a whole.

Appellant's fourth issue on appeal is without merit.

### III.   CONCLUSION

We affirm the trial court's judgment.


/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE


Do Not Publish
TEX. R. APP. P. 47

130176F.U05

---

[45] *See Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

NICKEY VAN EXEL a/k/a NICKEY
VANEXEL, Appellant

No. 05-13-00176-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-11-00424-W.
Opinion delivered by Justice FitzGerald.
Justices Fillmore and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 4th day of August, 2014.