**Bryan KESSEL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–03–00271–CR.**

Court of Appeals of Texas, Houston (14th Dist.).

July 27, 2004.

Glenn J. Youngblood, Houston, for appellant.

Eric Kugler, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices FROST and GUZMAN.

## OPINION

KEM THOMPSON FROST, Justice.

In this case, we must determine if the trial court erred in ordering the defendant removed from the courtroom and taken back to the jail, causing him to miss the entire punishment phase of his jury trial. We find reversible error, affirm the conviction, and reverse and remand for a new punishment hearing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Bryan Kessel was charged by indictment with burglary. He pleaded not guilty, but the jury found him guilty. The next morning, before the punishment phase began, the parties appeared before the trial court. The record reflects the following:

[Trial Court]: Both sides ready?

[Prosecutor]: The State is ready.

[Appellant's counsel]: Just for the record.

[Trial Court]: We're outside the presence of the jury. Yes. Lets [sic] make a record. We're outside the presence of the jury.

[Appellant's counsel]: Judge, at this time we have tried to communicate with Mr. Kessel, and he is nonresponsive. He appears to be, um—

[Trial Court]: He is slumped over in his chair.

[Appellant's counsel]: He is slumped over in his chair, uncommunicative, and we object to proceeding on the grounds of the 6th and 14th and 5th, 6th and 14th Amendment [sic] to the

United States Constitution and the corresponding Texas amendments.

[Trial Court]: All right. Let the record reflect that I have heard numerous reports to explain Mr. Kessel's appearance before me right now. He was wheeled into the courtroom by a deputy sheriff. When instructed by the deputy sheriff to get out of the wheelchair to get into the chair, he was certainly able to stand up to move himself from this wheelchair to the chair, which led the Court to believe that he, one, understood the request by the Sheriff's Department, secondly, was able to carry it out.

Deputy Holden is a lieutenant with the Sheriff's Department.

[Lieutenant Holden]: Yes, Your Honor.

[Trial Court]: Would you say you have the most understanding of what has transpired with Mr. Kessel to [sic] the people of the courtroom?

[Lieutenant Holden]: Of the people in this courtroom, yes, sir.

[Trial Court]: What's your understanding of what has transpired as to him?

[Lieutenant Holden]: That because [sic] his late return from court yesterday he didn't get his medication until later in the day. And at that point an effect took place on his body from the medication. He was alert earlier, he followed directions.

[Trial Court]: Earlier. You mean earlier today?

[Lieutenant Holden]: Earlier within the last half hour.

[Trial Court]: Where was that?

[Lieutenant Holden]: Down at the holding area, classification. He was given directions, followed those directions. He was taken to the dressing area. He dressed himself.

[Trial Court]: Standing?

[Lieutenant Holden]: Standing. He would lean at times, but standing, but because of the tremors we put him in a chair. Just now when I brought him into the courtroom I gave him directions, he stood, turned, sat in his chair. He did understand, followed the directions that I gave him.

[Trial Court]: Let there be no doubt that Mr. Kessel's appearance before me right now, it's markedly different than the appearance he has had before the jury for the last three days. There is no doubt in my mind, based upon what I have been told this morning by Lieutenant Holden, this is the first time Lieutenant Holden and I have talked about this, but other deputies have been relaying information to me about the behavior, and I was told earlier that he had removed his classification badge.

[Lieutenant Holden]: Yes.

[Trial Court]: Had to be taken to classification to be rebanded.

[Lieutenant Holden]: Yes, Your Honor.

[Trial Court]: There is no doubt in my mind this was nothing more than an attempt by Mr. Kessel to delay, impede, and perhaps prohibit the conclusion of this trial this morning. It's consistent with his behavior during the facts of this case when he was arrested. It is consistent with his behavior in numerous appearances before me when we had conversations, and I'm absolutely convinced this is nothing more than an attempt on his part to inhibit and perhaps prohibit the conclusion of this trial today.

The Court is of the opinion that his refusal to speak to his lawyers is nothing more than an attempt on his part to somehow sabotage the punishment phase of this trial. He has been able to respond to requests by the Sheriff's Department, so he is capable of hearing requests and commands and following those requests and commands appropriately.

Mr. Kessel, can you hear me right now?

All right. He has raised his head. He is not responding but he appears to the Court to be able to hear me right now. The Court is of the opinion that Mr. Kessel's current behavior and appearance is nothing more than a blatantly conscious attempt on his part to, one, if he cannot sabotage the punishment phase of the trial is [sic] to perhaps somehow incur some sort of sympathy from this jury as a result of his appearance and so—and since he intends not to communicate with his lawyers I'm going to order him removed from the courtroom for this punishment phase of the trial. You can remove him from the courtroom and take him back to the holdover.

[Appellant's counsel]: And, Judge, we would object to the same, same basis, because our understanding is that there is a medical basis and it would be difficult to determine exactly whether or not his current demeanor and attitude is a result of his seizure disorder or a result of faking.

[Trial Court]: All right. Your objection is denied.

[Appellant's counsel]: Thank you.

[Bailiff]: Are we to return him to the holdover in the back or the holdover in the jail in the jail which [sic] he is housed?

[Trial Court]: Take him—take him back period.

[Bailiff]: Until he can return to his housing?

[Trial Court]: Return to his house.

. . .

(Defendant removed)

. . .

(Open court, no defendant, jury present).

[Trial Court]: Members of the jury, Mr. Kessel is not going to be present in the courtroom during this punishment phase of trial. That is a decision that I have made for reasons known to me that are of no consequence and not to be considered by you during this stage of the trial. I have made the decision he is not going to be present, so I have ordered him to be removed from the courtroom.

In accordance with the trial court's order removing appellant from the courtroom, appellant was absent from the courtroom for the entire punishment phase of the trial. Appellant had pleaded not true to enhancement paragraphs alleging two prior burglary convictions. The jury found the allegations in both of the enhancement paragraphs to be true and assessed punishment at fifty-five years' imprisonment in the Texas Department of Criminal Justice—Institutional Division. The entire punishment phase of the trial took place on February 27, 2003, and the record shows that the jury never saw appellant in the courtroom at any time on that day. The next day, the trial court had appellant brought back to the courtroom for imposition of the sentence.

## II. STANDARD OF REVIEW

In determining whether the trial court abused its discretion, we consider whether the court acted without reference to guiding rules and principles—that is, whether the court acted arbitrarily or unreasonably. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex.Crim.App.1993). We must uphold the trial court's ruling so long as it is "within the zone of reasonable disagreement." *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim.App.2002).

## III. ISSUE AND ANALYSIS

■ In his second issue, appellant complains [1] that, by ordering him removed from the courtroom during the punishment phase, the trial court violated his right to be present in the courtroom under the Confrontation Clause of the Sixth and Fourteenth Amendments to the United States Constitution, under Article I, Section 10 of the Texas Constitution, and under article 33.03 of the Texas Code of Criminal Procedure.[2] Appellant's trial counsel also objected in the trial court that

---

1. The State asserts that appellant's right to be present in the courtroom during the punishment phase is subject to procedural default under ordinary preservation-of-error rules and that appellant failed to preserve error in the trial court. We disagree. Appellant's right to be present in the courtroom must be implemented by the judicial system unless expressly waived. *See Garcia v. State*, 149 S.W.3d 135, 142–45 (Tex.Crim.App.2003) (characterizing right to translation of trial when defendant does not understand English as part of defendant's right to be present in the courtroom during trial and holding that this right is not subject to ordinary preservation-of-error rules but must be implemented unless it is expressly waived); *see also Illinois v. Allen*, 397 U.S. 337, 342–43, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970) (holding that defendant's right to be present in courtroom during trial is not absolute and may be waived by consent or by disorderly and disruptive conduct). Appellant did not expressly waive his right to be present in the courtroom; rather, appellant's counsel timely objected to the trial court's order that appellant be removed from the courtroom, and the trial court overruled this objection.

2. Appellant does not argue that the Texas Constitution or the Texas Code of Criminal Procedure offer different levels of protection than the federal constitution; therefore, we consider only the federal constitutional complaint. *See Mitschke v. State*, 129 S.W.3d 130, 132 (Tex.Crim.App.2004).

the punishment phase should not proceed at that time based on appellant's condition and his inability to communicate with his counsel. On appeal, however, appellant does not assert that the trial court erred in proceeding while he was incapacitated; rather, appellant complains that the trial court erred by ordering him removed from the courtroom in violation of his right to be present during the punishment phase.

■ One of the most basic rights guaranteed by the Confrontation Clause is the defendant's right to be present in the courtroom at every stage of his trial. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). A criminal defendant may lose his constitutional right to be present at trial if, "after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Id.*, 397 U.S. at 343, 90 S.Ct. at 1060–61. Trial courts confronted with "disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Id.*, 397 U.S. at 343, 90 S.Ct. at 1061. When a defendant's behavior is of "an extreme and aggravated nature," that discretion encompasses expulsion from the courtroom. *Id.*, 397 U.S. at 346, 90 S.Ct. at 1062; *see also Ramirez v. State*, 76 S.W.3d 121, 129 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd).

Examples of conduct found to be of an "extreme and aggravated nature" include: (1) repeatedly arguing with the trial court in an abusive manner and threatening to kill the trial judge, *Allen*, 397 U.S. at 339–40, 90 S.Ct. at 1059; (2) making repeated, nonresponsive, profane, vulgar, and disruptive statements and exhibiting disruptive behavior, *Burks v. State*, 792 S.W.2d 835, 836–37 (Tex.App.-Houston [1st Dist.] 1990 pet. ref'd); (3) ignoring the trial court's warnings not to disrupt the proceedings and engaging in a violent scuffle with the bailiff, *Dotson v. State*, 785 S.W.2d 848, 853–54 (Tex.App.-Houston [14th Dist.] 1990, pet. ref'd); and (4) disrupting the trial by interjecting alleged facts that were not in evidence in front of the jury, and after being warned that continued disruptive behavior would result in removal from the courtroom, insisting to the trial court that his behavior was not disruptive in a manner the appellate court presumed was highly disruptive, *Ramirez*, 76 S.W.3d at 129–30.

■ Appellant's behavior, as reflected in the record before us, was not of an "extreme and aggravated nature" and did not warrant his expulsion from the courtroom. Nothing in the record approaches the level of disruptive, contumacious, defiant conduct necessary to justify the extraordinary action of removing a defendant from the courtroom during trial. Rather than engage in "noisy, disorderly, and disruptive" speech and conduct, appellant made no sound whatsoever. *See Allen*, 397 U.S. at 338, 90 S.Ct. at 1058. Appellant simply sat, "slumped over in his chair," silent and "nonresponsive."

The trial court stated that, sometime earlier, appellant had removed his classification badge. The trial court also stated that appellant's behavior was consistent with his behavior when he was arrested, apparently referring to appellant's flight from police officers before he was apprehended and his escape from a police car after he was handcuffed. Though this court does not condone appellant's alleged removal of his classification badge while in custody, his flight from police officers, or his apparent escape from a police car, none of these acts took place inside the courtroom, and none of them provides a suffi-

cient basis to remove appellant from the courtroom during the punishment phase of his trial. Furthermore, appellant could have engaged in all of these prior behaviors and still have been physically incapacitated the morning that the punishment phase of his trial was to begin.

The trial court stated that it had no doubt that appellant was pretending to be physically incapacitated, but there are other indications in the record that appellant might have been experiencing genuine health problems. Lieutenant Holden stated that appellant was late in receiving certain medication and that "an effect [had taken] place on [appellant's] body." Appellant had to be transported from the jail to the courtroom in a wheelchair. Though Lieutenant Holden indicated that appellant had followed instructions that morning to dress himself and to get in and out of the wheelchair, conduct of this nature is not necessarily inconsistent with appellant having experienced problems with his health or medication. Furthermore, Lieutenant Holden also stated that appellant

leaned at times when he was dressing himself and that he was placed in the wheelchair because he was experiencing tremors. There is no evidence that Lieutenant Holden is qualified to give medical opinions, and he did not offer an opinion as to whether he believed appellant was pretending to be incapacitated. Nonetheless, Lieutenant Holden's statements did not provide a sound basis for the trial court to conclude appellant was pretending to suffer physical incapacity rather than actually experiencing health problems.

While the jury was deliberating and after it was too late to try to remedy any harm to appellant from the trial court's order removing him from the courtroom, the trial court heard testimony from a jail physician, Dr. Frank, who had evaluated appellant that morning. Dr. Frank's testimony further confirmed that appellant might have been experiencing actual physical symptoms either from a recent seizure or from taking his medication that morning.[3] Though we do not consider this med-

---

**3.** Dr. Frank testified as follows:

(1) Three weeks earlier, appellant had reported a seizure and had been prescribed a daily dose of Dilantin, an antiseizure medication.
(2) If appellant were to miss a day of this medication he would be more at risk of a seizure.
(3) Appellant was brought to Dr. Frank at 7:30 a.m. "laying sleeping on [a] stretcher with vomit coming out of his mouth."
(4) Dr. Frank evaluated appellant for reported seizure activity.
(5) It is documented that appellant's medical history includes a seizure disorder.
(6) Though appellant obeyed specific instructions, he appeared very drowsy and hardly opened his eyes the entire time. This reaction is common for somebody who has just had seizure activity.
(7) Dr. Frank tested appellant's blood for the level of Dilantin and found that it was 9.1. The therapeutic range for Dilantin is between 10 and 20.

(8) Some people have seizures even when the antiseizure medication in their bloodstream is within therapeutic levels, so the therapeutic levels are merely a guide.
(9) Dilantin makes some people sleepy. Dr. Frank had appellant take a dose of Dilantin that morning and told him to "sleep it off."
(10) Dr. Frank stated appellant appeared oriented to person, place, and time but that he did not test him for higher brain functions and would not know whether he was impaired in any way.
(11) The stress of being in trial, having been convicted, and facing a sentence of twenty-five years to life in prison could induce a person who has a seizure disorder to have a seizure.
(12) A person with a seizure disorder could intentionally not take their medication in an attempt to induce seizures. Likewise, a person with a seizure disorder could try to fake symptoms of a seizure. It is hard to determine if appellant was faking his symptoms, but in Dr. Frank's opinion, appellant

ical testimony in determining whether the trial court abused its discretion, we note that it would have been prudent for the trial court to have heard this testimony before ordering appellant removed from the courtroom and taken back to the jail. *See Dragoo v. State,* 96 S.W.3d 308, 313 (Tex.Crim.App.2003) (noting general rule that appellate court reviews propriety of trial court's ruling based on evidence before the trial court at the time of the ruling). After carefully reviewing the record, we find no evidence of any "extreme and aggravated" conduct by appellant that was "so disorderly, disruptive, and disrespectful of the court" that his trial could not have been "carried on with him in the courtroom." *Allen,* 397 U.S. at 343, 346, 90 S.Ct. at 1060–61, 1062. Furthermore, even presuming that appellant was only pretending to have suffered a seizure, as the trial court believed, the trial court did not warn appellant that it would order appellant removed from the courtroom if he continued the allegedly disruptive behavior. *See Allen,* 397 U.S. at 343, 90 S.Ct. at 1060–61; *Ramirez,* 76 S.W.3d at 129–30 (stating that defendant must be warned before being removed from courtroom and finding that trial court did warn defendant before ordering his removal). Inexplicably, when asked by the bailiff whether appellant should be removed to the holdover area near the courtroom or whether appellant should be taken back to the jail, the trial court ordered appellant returned to the jail, precluding any possibility that appellant at least could have listened to the proceedings during the punishment phase. *See Allen,* 397 U.S. at 351, 90 S.Ct. at 1064 (Brennan, J., concurring) (stating that "when a defendant is excluded from his trial, the court should make reasonable efforts to enable him to communicate with his attorney and, if possible, to keep apprised of the progress of his trial ... it is not weakness to mitigate the disadvantages of his expulsion as far as technologically possible in the circumstances"); *Ramirez,* 76 S.W.3d at 129–30 (affirming trial court's order removing defendant from courtroom when trial court allowed defendant to listen to the proceedings in the holdover area near the courtroom).

The State asserts the trial court did not abuse its discretion in determining that appellant was intentionally trying to disrupt the courtroom proceedings based in part on appellant's filing of several pretrial motions *pro se,* even though he was represented by counsel. Appellant filed all of these *pro se* documents before trial. None of them indicate any attempt to disrupt, delay, or sabotage the trial. In fact, the trial court ruled on two of appellant's *pro se* motions, granting one of them. The State also asserts that, at one point during the guilt-innocence phase of the trial, appellant addressed the court directly despite being represented by counsel. On that occasion, appellant's remarks to the trial court were out of the hearing of the jury. More importantly, appellant addressed the court directly only after the trial judge directly asked him a question. We find no merit in the State's arguments.

We conclude the trial court's order removing appellant from the courtroom for the entire punishment phase of his trial was not "within the zone of reasonable disagreement" and constituted an abuse of discretion. *Wheeler,* 67 S.W.3d at 888; *Shaw v. State,* 846 S.W.2d 482, 486–87 (Tex.App.-Houston [14th Dist.] 1993, pet. ref'd) (holding trial court erred in having

did have a seizure because he was so drowsy and that is usually associated with having a seizure.

defendant bound and gagged in presence of the jury during punishment phase); *Sanchez v. State,* 702 S.W.2d 258, 259 (Tex. App.-Dallas 1985, pet. ref'd) (holding trial court erred in excluding defendant from courtroom during part of his trial). This error is of constitutional magnitude.

■ Having found this constitutional error, we must reverse the judgment as to punishment unless we determine beyond a reasonable doubt that the error did not contribute to the jury's assessment of punishment at fifty-five years' confinement. *See* TEX.R.APP. P. 44.2(a); *Garcia v. State,* 149 S.W.3d 135, 146 (Tex.Crim.App.2004) (characterizing right to translation of trial when defendant does not understand English as part of defendant's right to be present in the courtroom during trial and holding that court of appeals should assess harm for violation of this right under TEX. R.APP. P. 44.2(a)); *Ramirez,* 76 S.W.3d at 130. The punishment phase did not last long in this case. The State reoffered the same evidence offered and admitted during the guilt-innocence phase as well as two penitentiary packets that it asserted were from appellant's two prior burglary convictions. The State also offered expert testimony from Deputy R. Shield that the fingerprints of the person convicted in the two penitentiary packets are the same and are appellant's fingerprints. Appellant's counsel did not cross-examine Deputy Shield and did not offer any evidence other than re-offering the defense evidence admitted during the guilt-innocence phase.

In closing arguments, the State argued that because this was appellant's third burglary conviction, the jury should assess punishment at life in prison so that appellant could not continue committing burglaries. Appellant's counsel focused on the fact that, even if the jury found this to be appellant's third burglary conviction, this burglary did not involve any physical injury and involved only minimal property damage. Appellant's counsel sought to evoke sympathy for appellant and asked the jury to assess punishment at the minimum of twenty-five years' confinement, if the jury found the enhancement paragraphs true.

The jury found the enhancement paragraphs true and assessed punishment at fifty-five years' confinement, which is in the middle of the punishment range for this offense. Although the trial court instructed the jury not to consider why the trial court had ordered appellant removed from the courtroom, the trial court did not instruct the jury to disregard the fact— regardless of the reasons therefor—that the trial court had ordered appellant removed from the courtroom. When a trial court takes the extreme measure of ordering a defendant removed from the courtroom for the entire punishment phase of his trial, the jury is likely to make a negative inference simply from the fact that the trial court ordered him removed. *See Shaw,* 846 S.W.2d at 486–87. We cannot say with confidence that the trial court's error did not affect the jury's assessment of punishment to appellant's detriment, especially in light of the State's argument based on recidivism and the continuing danger to the community the State claimed appellant posed. The jury may have been more receptive to this argument and the need to protect the community from appellant and his allegedly incorrigible conduct after having just learned that the trial court had ordered appellant removed from the courtroom for the rest of the trial. We cannot say beyond a reasonable doubt that the trial court's error did not contribute to the jury's assessment of punishment. *See*

Tᴇx.R.Aᴘᴘ. P. 44.2(a); *Shaw*, 846 S.W.2d at 486–87; *Sanchez*, 702 S.W.2d at 259. Accordingly, we sustain appellant's second issue.[4]

Because appellant does not challenge his conviction on appeal, we affirm the conviction, reverse the trial court's judgment as to punishment, and remand to the trial court for a new punishment hearing consistent with this opinion.

---

**4.** Appellant's first issue, if sustained, would only provide him with a new punishment hearing, so we need not address it.