Opinion by: Sandee Bryan Marion, Chief Justice
Appellant, Billy Ray Monreal, was indicted for intentionally and knowingly causing the death of Eugene Sanchez by shooting Sanchez with a pistol. Eugene's brother, Johnny Sanchez, also was shot, but he could not identify who shot him. The indictment in this case does not charge appellant with shooting Johnny Sanchez.
A jury found appellant guilty of murder and assessed punishment at forty years' confinement. Following a hearing on appellant's motion for new trial, the trial court denied the motion. On appeal, appellant does not challenge the sufficiency of the evidence in support of the jury's verdict. Instead, appellant complains (1) trial counsel failed to call certain defense witnesses during the guilt-innocence phase of trial; (2) two of his family members were excluded from the courtroom during voir dire; (3) the trial court erred by denying the admission into evidence of prior inconsistent statements of two jurors during the hearing on appellant's motion for new trial; (4) the jurors improperly discussed parole law during punishment deliberations; and (5)
*722 the trial court erred by not allowing him to return to the courtroom after he was removed during the punishment phase of trial. We affirm.
STANDARDS OF REVIEW
On appeal, appellant raises several arguments under the broader categories encompassing the denial of his motion for new trial and ineffective assistance of counsel.
A. Denial of Motion for New Trial
We review a trial court's denial of a motion for new trial for an abuse of discretion, reversing only if the trial court's decision was clearly erroneous and arbitrary. Riley v. State , 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). A trial court abuses its discretion if no reasonable view of the record could support the trial court's ruling. Id. Under this deferential standard of review, we view the evidence in the light most favorable to the trial court's ruling. Id. We may not substitute our judgment for that of the trial court and we must uphold the trial court's ruling if it is within the zone of reasonable disagreement. Id. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. (quoting Anderson v. City of Bessemer City , 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ). This same deferential review must be given to the trial court's determination of historical facts when it is based solely on affidavits, regardless of whether the affidavits are controverted. Id. The trial court is free to disbelieve an affidavit, especially one unsupported by live testimony. Id.
B. Ineffective Assistance of Counsel
To prevail on a claim of ineffective assistance of counsel, appellant must establish by a preponderance of evidence that: (1) his attorney's performance was deficient; and (2) his attorney's deficient performance deprived him of a fair trial. Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellant must satisfy both Strickland elements, and the failure to show either deficient performance or prejudice will defeat the claim. Perez v. State , 310 S.W.3d 890, 893 (Tex. Crim. App. 2010).
"In assessing prejudice under Strickland , the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." Harrington v. Richter , 562 U.S. 86, 111, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). "Instead, Strickland asks whether it is 'reasonably likely' the result would have been different." Id. "The likelihood of a different result must be substantial, not just conceivable." Id. "It will not suffice for [a]ppellant to show 'that the errors had some conceivable effect on the outcome of the proceeding.' " Perez , 310 S.W.3d at 894 (quoting Strickland , 466 U.S. at 693, 104 S.Ct. 2052 ).
We presume the attorney's representation fell within the wide range of reasonable and professional assistance. Mallett v. State , 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). Ineffective assistance claims must be firmly founded in the record to overcome this presumption. Thompson v. State , 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). When the record is silent as to trial counsel's strategy, we will not conclude appellant received ineffective assistance unless the challenged conduct was " 'so outrageous that no competent attorney would have engaged in it.' " Goodspeed v. State , 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting Garcia v. State , 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) ). However, in this case, we do not have a silent record because the trial court conducted a hearing on appellant's motion for *723 new trial at which trial counsel and other witnesses testified.
INEFFECTIVE ASSISTANCE OF COUNSEL
Two of the grounds on which appellant sought a new trial were that he received ineffective assistance of counsel during trial because his attorney failed to call two witnesses and he failed to object when he learned two members of appellant's family were not allowed in the courtroom during jury selection.[1]
A. Not Calling Defense Witnesses
Appellant first contends his trial counsel was ineffective because counsel failed to obtain the testimony of two witnesses during the guilt-innocence phase of trial: Brandon Monreal and Edward Morales. An appellant complaining about trial counsel's failure to call witnesses must show the witnesses were available and he would have benefitted from their testimony. King v. State , 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) ; Cantu v. State , 993 S.W.2d 712, 719 (Tex. App.-San Antonio 1999, pet. ref'd).
At trial, appellant's defense was that he did not shoot and kill Sanchez and, instead, Edward Morales fired the fatal shots. During the guilt-innocence phase of trial, the defense called seven witnesses who testified either that Morales was the person who fired the shots or Morales had the gun. One of these witnesses stated he saw a man-presumably Morales-fire a gun into the air and then straight ahead, after which Eugene Sanchez fell to the ground. Three of these witnesses said they heard Morales yell, "stop or I'll shoot" or "Hey everyone f- stop," and they saw Morales fire the gun into the air and then point the gun forward and shoot one or more times. Appellant testified in his own behalf and stated he heard gunshots from behind him, and then he heard Morales say, "I got them. I got both of them."
At the new trial hearing, appellant's nephew, Brandon Monreal, testified he saw Edward Morales run away from the scene of the shooting, shouting that he had shot Sanchez. Brandon testified at the new trial hearing that he was inside his grandmother's house and, although he did not hear any gunshots, he heard "a bunch of yelling." When he heard the yelling, he ran outside and saw Edward Morales running away from where the shooting happened and he was holding a pistol. Brandon said Morales looked happy and he was jumping up and down and yelling, "I shot that mother-" and "I got that n-."
In Brandon's affidavit attached to appellant's motion for new trial, Brandon stated he would have been available to testify at trial. Edward Morales did not testify at the new trial hearing, and there is no evidence he was available to testify at trial.
Appellant's trial counsel, Fernando Cortes, testified at the new trial hearing indicating he was the second attorney to represent appellant, and he was substituted as retained counsel about one month before jury selection commenced. He said he had tried only one murder trial prior to appellant's case, but he had tried over 215 criminal trials all over the State of Texas. He considered himself an experienced trial attorney, and he could recall only one ineffective assistance claim against him in the past. Cortes stated he was not able to obtain appellant's file from the first defense attorney, and he received discovery about two weeks before trial started. In the days following jury selection, he also received the gunshot residue report and *724 the autopsy. Cortes stated he was unprepared for trial in this case that had been pending for almost three years.
As to Brandon Monreal's testimony, Cortes testified he did not remember what Brandon's testimony would have been because "there were just so many people that were brought to [his] attention for the first time [during trial]. They weren't listed anywhere." He did not request a copy of the State's witness list and he had no strategy for not doing so. He said he was surprised by some of the State's witnesses, and he could have done more. Cortes stated he did not recall trying to find Brandon once the significance of Brandon's testimony became evident during trial. He said he had no strategic reason for not trying to interview Brandon during trial. Regarding Edward Morales's testimony, Cortes testified he did not realize the significance of Morales's testimony until trial, but because of the late date, he had no way to find Morales. When asked if he had requested a continuance from the trial court to try to locate Morales, Cortes responded that he had asked the court to appoint an investigator to help him locate the witness. Cortes said he had no strategic reason for not requesting a continuance or for not trying to interview Morales during trial. On cross-examination, Cortes admitted he called John Monreal, Richard Harrington, Matthew Woodson, Gino Rodriguez, and Michael Reyes-all of whom testified either that Edward Morales was the shooter or that they saw Morales with the gun. Most of these witnesses were wearing orange jail jumpsuits when they testified, which Cortes thought presented a credibility problem for the jury. When asked whether Brandon Monreal would have added anything not already introduced at trial, Cortes responded
I don't know if I ever had anybody-any of the witnesses testify that they heard Edward [Morales] specifically make the admission that he had shot them [the two victims] the way Brandon had indicated in his affidavit. I don't think I had such a witness.
Cortes was then asked, "Well, you had even better testimony than that because you had witnesses that said they saw Edward shoot." To which counsel responded, "That's correct."
We conclude appellant did not establish trial counsel was ineffective for not calling Morales as a witness because there is no showing Morales would have been available to testify. See King , 649 S.W.2d at 44 ; Cantu , 993 S.W.2d at 719. Brandon Monreal, however, said he would have been available to testify that he saw Edward Morales run away from the scene of the shooting, shouting that he had shot Sanchez. Even if it could be argued the failure to call Brandon Monreal at trial was ineffective assistance, there must also be a showing of prejudice under the second prong of Strickland . Seven defense witnesses stated they either saw Morales fire the fatal shots or they saw him with the gun. Appellant testified he heard Morales say, "I got them. I got both of them." Under Strickland , appellant had the burden to show "whether it is 'reasonably likely' the result [of the trial] would have been different." Harrington , 562 U.S. at 111, 131 S.Ct. 770. "The likelihood of a different result must be substantial, not just conceivable." Id. On this record, given the number of defense witnesses who testified Morales, and not appellant, was the person who either had a gun or fired the fatal shots, we cannot conclude appellant has shown his defense was prejudiced by the lack of the same testimony from Brandon Monreal. Also, the jury, as the factfinder, was entitled to judge the credibility of the witnesses and could choose to believe all, some, or none of the testimony presented by the parties. See *725 Queeman v. State , 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). Because appellant has not shown his attorney's deficient performance deprived him of a fair trial, we hold the trial court did not err in denying appellant's motion for new trial on this ground.
B. Family Excluded From Courtroom
Appellant next asserts two of his family members were barred from the courtroom during voir dire in violation of his right to a public trial. During oral arguments, appellate counsel insisted he raised this complaint as both a stand-alone issue and a complaint in the context of ineffective assistance of counsel because trial counsel did not object to the courtroom being closed to the public when he realized appellant's family members were not allowed in the courtroom during jury selection. The State argued, however, that appellant raised the closed-courtroom argument only in the context of an ineffective assistance of counsel claim. We will liberally construe appellant's brief as raising both arguments. We first address his argument that counsel was ineffective for not objecting to the closed courtroom.
Appellant's two sisters testified at the new trial hearing that they arrived early at the courthouse to watch jury selection, but they were not allowed into the courtroom. Both sisters stated a courthouse bailiff told them they could not enter the courtroom. They stated they watched jury selection through the windows of the closed courtroom doors. One of appellant's sisters admitted she wore a T-shirt that said "Free Billy." The other sister denied wearing such a T-shirt. According to his sisters, they were allowed into the courtroom when the defense began its voir dire after lunch. One of appellant's sisters testified that the Wednesday before jury selection, at a pretrial hearing, her nephew and a member of the victim's family got into an altercation in the hallway.
The bailiff testified over 100 venire members were present, an unusually large number for a trial in Medina County. He said his first concern when he saw appellant's family was that he did not want a repeat of the altercation that occurred the previous Wednesday because there was a large number of people present in the courtroom. He stated he did not tell appellant's sisters they could not enter the courtroom. Instead, he said he asked them to give him time for room inside the courtroom to become available after venire members were excused based on various exemptions or disqualifications. He said when additional seating became available inside the courtroom, the sisters came into the courtroom before voir dire began.
When asked about appellant's family not being allowed in the courtroom, Cortes testified he remembered being told during a break in trial, but he did not approach the trial court because he "was just so overwhelmed with the voir dire."
An accused has a right to a public trial under the federal and state constitutions, as well as under the Texas Code of Criminal Procedure. U.S. CONST. , amend. VI ; TEX. CONST. , art. I, § 10 ; TEX. CODE CRIM. PROC. ANN. § 1.24 (West) ("The proceedings and trials in all courts shall be public."). The Sixth Amendment right to a public trial extends to the voir dire of prospective jurors. Presley v. Georgia , 558 U.S. 209, 213, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010). The U.S. Supreme Court has held a "defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." Waller v. Georgia , 467 U.S. 39, 49, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) ; see also Steadman v. State , 360 S.W.3d 499, 510 (Tex. Crim. App. 2012). In this case, on appeal, appellant does not assert he suffered actual prejudice. Instead, relying on Waller , he argues he is not required *726 to show prejudice and this case must be remanded for a new trial. However, after appellant filed his appellate brief, the United States Supreme Court issued its decision in Weaver v. Massachusetts , --- U.S. ----, 137 S.Ct. 1899, 198 L.Ed.2d 420 (2017).[2]
In Weaver , the courtroom was occupied by potential jurors and closed to the public for two days during jury selection. Defendant's mother told defense counsel about the closure at some point during jury selection. However, counsel "believed that a courtroom closure for [jury selection] was constitutional." Id. at 1906. As a result, counsel did not object to the closure at trial or raise the issue on direct review. Id. Instead, the issue was raised for the first time five years later in a post-conviction collateral attack based on ineffective assistance of counsel.
The Weaver Court recognized that a violation of the right to a public trial is structural error. Id. at 1908. "[I]n the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.' " Id. at 1910 (quoting Neder v. United States , 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ). However, the Weaver Court was confronted with the question of "whether invalidation of the conviction is required here as well, or if the prejudice inquiry is altered when the structural error is raised in the context of an ineffective-assistance-of-counsel claim." Id. at 1905.
The Court held:
[W]hen a defendant raises a public-trial violation via an ineffective-assistance-of-counsel claim, Strickland prejudice is not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or ... to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair.
Id. at 1911. The Court noted that, when the defendant does not simultaneously object but instead raises the issue of courtroom closure in an ineffective-assistance claim, "the trial court is deprived of the chance to cure the violation either by opening the courtroom or by explaining the reasons for the closure." Id. at 1912.
The Court concluded Weaver failed to show prejudice under Strickland , observing:
It is of course possible that potential jurors might have behaved differently if [Weaver's] family had been present. And it is true that the presence of the public might have had some bearing on juror reaction. But here [Weaver] offered no evidence or legal argument establishing prejudice in the sense of a reasonable probability of a different outcome but for counsel's failure to object.
In other circumstances a different result might obtain. If, for instance, defense counsel errs in failing to object when the government's main witness testifies in secret, then the defendant might be able to show prejudice with little more detail. Even in those circumstances, however, the burden would remain on the defendant to make the prejudice showing ... because a public-trial violation does not always lead to a fundamentally unfair trial[.]
Id. at 1912-13 (internal citations omitted).
The Court also considered whether counsel's failure to object rendered the *727 trial fundamentally unfair. The Court concluded Weaver had not made the showing, holding:
... Although [Weaver's] mother and her minister were indeed excluded from the courtroom for two days during jury selection, [Weaver's] trial was not conducted in secret or in a remote place. ... The closure was limited to the jury voir dire; the courtroom remained open during the evidentiary phase of the trial; the closure decision apparently was made by court officers rather than the judge; there were many members of the venire who did not become jurors but who did observe the proceedings; and there was a record made of the proceedings that does not indicate any basis for concern, other than the closure itself.
There has been no showing, furthermore, that the potential harms flowing from a courtroom closure came to pass in this case. For example, there is no suggestion that any juror lied during voir dire; no suggestion of misbehavior by the prosecutor, judge, or any other party; and no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands.
It is true that this case comes here on the assumption that the closure was a Sixth Amendment violation. And it must be recognized that open trials ensure respect for the justice system and allow the press and the public to judge the proceedings that occur in our Nation's courts. Even so, the violation here did not pervade the whole trial or lead to basic unfairness.
In sum, [Weaver] has not shown a reasonable probability of a different outcome but for counsel's failure to object, and he has not shown that counsel's shortcomings led to a fundamentally unfair trial. He is not entitled to a new trial.
Id. at 1913.
We conclude the Court's reasoning in Weaver controls the outcome in this case.[3] Appellant is not entitled to a presumption of prejudice because he raised the closed-courtroom complaint via an ineffective-assistance claim. Weaver , 137 S.Ct. at 1911. During oral arguments, appellate counsel was asked how appellant was prejudiced by trial counsel's ineffectiveness. Counsel responded by referring this court to Presley v. Georgia , 558 U.S. 209, 213, 130 S.Ct. 721, 175 L.Ed.2d 675 (2010)
*728 (holding accused has right to insist voir dire of the jurors be public), and by stating that family members absent from voir dire is harmful. The Presley opinion issued several years before Weaver and did not involve an ineffective assistance of counsel claim. To the degree appellate counsel is arguing that the exclusion of family members from the courtroom is per se harmful, we do not believe Weaver supports that argument in the context of an ineffective-assistance-of-counsel claim. We, therefore, consider whether appellant showed prejudice under Strickland and whether trial counsel's failure to object rendered appellant's trial fundamentally unfair.
Here, there is no dispute appellant's sisters were not in the courtroom during the qualification phase of jury selection. However, the testimony provides for two different scenarios as to when his sisters entered the courtroom: (1) before commencement of voir dire or (2) after the State completed its voir dire but before the defense began its voir dire. The qualification of the potential jurors and the State's voir dire were not conducted in secret. The courtroom was open for the remainder of trial beginning, at the latest, with the defense's voir dire. The bailiff alone made the decision to ask appellant's sisters to wait outside the courtroom until seats became available.
On this record, appellant "has not shown a reasonable probability of a different outcome but for counsel's failure to object, and he has not shown that counsel's shortcomings led to a fundamentally unfair trial." Id. at 1913. Therefore, we hold the trial court did not err in denying appellant's motion for new trial on the ground that his trial counsel was ineffective for not raising a closed-courtroom complaint during trial. We next address appellant's stand-alone closed-courtroom argument.
CLOSED COURTROOM
Appellant also asserts the trial court erred by denying his motion for new trial on the ground that the courtroom was closed during voir dire.
"[A] complaint that a defendant's right to a public trial was violated is subject to forfeiture" and must be preserved for appellate review. Peyronel v. State , 465 S.W.3d 650, 653 (Tex. Crim. App. 2015) ; see also Weaver , 137 S.Ct. at 1910 ("in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.' ") (emphasis added) (quoting Neder v. United States , 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ); Turner v. State , 413 S.W.3d 442, 447 (Tex. App.-Fort Worth 2012, no pet.) ("Although the violation of the right to a public trial is structural error-that is, error that does not require an appellant to prove specific prejudice to obtain a new trial[,]-a complaint that the right to a public trial was violated is nevertheless subject to procedural error preservation rules ...."). Although an appellant is "not required to use 'magic language' to preserve his public-trial complaint for review, [an appellant has] the burden to 'state [ ] the grounds for the ruling ... sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context.' " Peyronel , 465 S.W.3d at 654 (quoting TEX. R. APP. P. 33.1).
To be timely, an appellant "must complain at the earliest possible opportunity, which arises as soon as the error becomes apparent such that the party knows or should know that an error has occurred." Woods v. State , 383 S.W.3d 775, 780 (Tex. App.-Houston [14th Dist.] 2012, pet. ref'd) (citing *729 Hollins v. State , 805 S.W.2d 475, 476 (Tex. Crim. App. 1991) ). The preservation requirement serves three purposes: (1) ensure the trial court will have an opportunity to prevent or correct errors, thereby eliminating the need for costly and time-consuming appeal and retrial; (2) guarantee opposing counsel has a fair opportunity to respond to complaints; and (3) promote the orderly and effective presentation of the case to the trier of fact. Id. In this case, before we can address the merits of appellant's complaint, we must determine whether trial counsel preserved his complaint by objecting at the earliest possible opportunity. On appeal, appellant contends he preserved his complaint in his motion for new trial.
At the new trial hearing, trial counsel testified as follows:
Q. Were you ever made aware that members of [appellant's] family were not allowed into the courtroom during jury selection?
A. Yes. I saw that.
Q. Did you ever inform either the trial judge about that or any other personnel in the case about [appellant's] family not being allowed in the courtroom?
A. I didn't approach the Court about it. I remember them mentioning it to me during a break.
Q. Was that the lunch break?
A. It might have been. I imagine so, but I was just so overwhelmed with the voir dire. I-I did see what was happening, but I didn't do anything about it.
...
Q. While the State was doing their jury selection in the morning, were you ... seated at counsel table in such a way that you could see the back of the courtroom where the panel was sitting?
A. Yes.
Q. Okay.
A. That's how I was able to see the family from ... behind the door. They were outside the courtroom.
It is clear from the record trial counsel was aware family members were not present in the courtroom during the State's voir dire, although the reason for their absence may not have been communicated to him until the break before he began his voir dire. Nevertheless, trial counsel made the affirmative decision to not bring the family's absence to the trial court's attention at any point in time. Therefore, counsel did not contest the closure of voir dire at his earliest opportunity. See Woods , 383 S.W.3d at 777, 781 (complaint preserved for appeal because trial counsel became aware of closure after voir dire concluded and raised complaint the next day in motion to trial court); Mosley v. State , 05-15-00010-CR, 2016 WL 347137, at *1 (Tex. App.-Dallas Jan. 28, 2016, pet. ref'd) (appellant did not preserve this argument because he failed to make an objection before the trial court). Accordingly, appellant's stand-alone closed-courtroom complaint was not preserved for our review.
DISCUSSION OF PAROLE LAW
As his third basis for seeking a new trial, appellant asserted the jurors improperly discussed parole law during deliberations. In a separate issue on appeal, appellant asserts the trial court erred by denying into evidence the prior inconsistent statements of the two jurors who testified at the new trial hearing regarding any parole law discussions.
At the new trial hearing, juror G.M. testified she was present during deliberations, and she was interviewed by an investigator who worked for the attorney who represented appellant at the new trial hearing. G.M. stated that, during deliberations, some jurors wanted to assess punishment at less than forty years and others at more than forty years. G.M. said she brought up parole and then another juror said, "they usually only serve half their *730 sentence." But, she said it was a casual statement and, on cross-examination, she agreed with the State that no one ever said, "this is parole law" or "this is what the law says as a fact." G.M. stated the "law was not discussed," and deliberations were based on the evidence presented at trial. G.M. said that because appellant was so young, "he really had to have some hope," therefore, the possibility he could serve a shorter sentence made it easier for her to vote to give him the longer sentence of forty years.
At the new trial hearing, juror P.F. also testified she was present during deliberations and she was interviewed by an investigator. P.F. said she did not recall the topic of parole arising during deliberations, she denied telling the investigator that jurors agreed on forty years as long as appellant served half that time, she did not recall anyone saying appellant would only serve half his time, and she denied telling the investigator that if appellant "does good, he can go in front of parole. He will get half. That would be 20 years." Instead, she said she "didn't say it in those words," and she told the investigator the jurors could not take parole into consideration.
Stephen Fuchs, the investigator, testified he interviewed G.M. and P.F. and he recorded both conversations. At this point, appellant's attorney asked to admit the recordings into evidence for impeachment purposes as prior inconsistent statements. The State objected that the recordings were not proper impeachment under Texas Rule of Evidence 613. The trial court sustained the objection. Fuchs then testified about his conversations with each juror.
Finally, M.R., the jury foreman, testified he did not recall any juror stating the law on parole, stating he or she was an expert on parole law, or anyone changing their mind about punishment because of parole. However, he said he heard someone mention appellant would be eligible for parole at some point, but because no one knew the specifics about parole law, "it was not given any weight ... in the final decision about sentencing."
A. Admission of Prior Inconsistent Statements
On appeal, appellant asserts he satisfied the requirements of Texas Rule of Evidence 613 ; therefore, the trial court erred by denying the prior inconsistent statements made by G.M. and P.F. into evidence.[4] We will assume without deciding the trial court erred by not admitting one or both of the recordings of Fuchs's conversations with the jurors, and next consider whether appellant was harmed.
The erroneous admission of evidence is nonconstitutional error and is subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b). TEX. R. APP. P. 44.2(b) ; Johnson v. State , 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Rule 44.2(b) provides that "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). In other words, after examining the record as a whole, an appellate court must disregard the error if it has fair assurance that the error did not influence the jury or had but a slight effect. Johnson , 967 S.W.2d at 417. This question leads to the next issue, which is whether the trial court erred by denying appellant's motion for new trial on the ground that the jury improperly discussed parole law during deliberations.
*731 B. Motion for New Trial Based on Discussion of Parole Law
Discussion of parole by the jury during its deliberation is not proper.[5] Colburn v. State , 966 S.W.2d 511, 519 (Tex. Crim. App. 1998). The introduction of evidence on the operation of parole and good conduct laws is prohibited. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(d) (West Supp. 2016). Not every mention of parole, however, warrants a drastic remedy. Colburn , 966 S.W.2d at 519. This impropriety constitutes reversible error only on a showing by the defendant of: (1) a misstatement of the law; (2) asserted as a fact; (3) by one professing knowledge of the law; (4) on which other jurors rely; and (5) who for that reason changed their vote to a harsher punishment. Sneed v. State , 670 S.W.2d 262, 266 (Tex. Crim. App. 1984).[6] Satisfying this standard also establishes harm because the fifth prong requires proof that a juror changed his or her vote to a harsher punishment. Salazar v. State , 38 S.W.3d 141, 147 n.2 (Tex. Crim. App. 2001).
Assuming the trial court should have admitted either or both of the Fuchs recordings as prior inconsistent statements, the inconsistent statement merely created a credibility question for the trial court to resolve on the Sneed factors. We review a trial court's ruling denying a defendant's motion for new trial for an abuse of discretion. Salazar , 38 S.W.3d at 148. "We do not substitute our judgment for that of the trial court, but simply determine whether the trial court's Sneed analysis was arbitrary or unreasonable." Id. "The trial court is the sole judge of the credibility of the testifying jurors." Id. "Where there is conflicting evidence on an issue of fact as to jury misconduct, the trial judge determines the issue and there is no abuse of discretion in overruling the motion for new trial." Id.
*732 We hold appellant failed to establish, at a minimum, the second and third prongs of the Sneed test. At most, all that was stated during deliberations was that appellant might serve half of a forty-year sentence. G.M. admitted she brought up parole and then another juror said "they usually only serve half their sentence." However, she said it was a casual statement and she agreed with the State on cross-examination that no one ever said, "this is parole law" or "this is what the law says as a fact." In her recorded statement, G.M. said some jurors initially wanted to assess a fifty-year sentence, but everyone decided to compromise on a forty-year sentence. In her recorded statement, P.F. said there were four jurors, including herself, who wanted to assess a fifty-year sentence, other jurors wanted to assess thirty, and one juror wanted to assess twenty. She said that after all the jurors talked about punishment, she agreed to "go down" to forty years because appellant would probably only serve twenty years. P.F. said the one juror who wanted to assess twenty years went up to forty after he reviewed all of appellant's prior offenses. Neither P.F. nor G.M. stated anyone "professing knowledge of the law" asserted parole law "as a fact."
On this record, we hold (1) appellant was not harmed by the denial into evidence of the Fuchs recordings and (2) the trial court did not err in denying appellant's motion for new trial on the ground that parole was discussed during deliberations because appellant did not satisfy all the Sneed test prongs.
REMOVING APPELLANT FROM THE COURTROOM
The State called four witnesses during the punishment phase of trial. The following outburst by appellant occurred during defense counsel's cross-examination of the third witness, Johnny Sanchez:
Appellant: Johnny, you know who shot him, Bro. You know who shot him, Bro. You saw him.
Trial court: Mr. Monreal. Mr. Monreal, one more remark out of you-
(Mr. Monreal still speaking).
Trial court: We'll have to remove him out of the courtroom, please.
The Bailiff: Come with me.
Appellant: You know I didn't shoot him, Bro. You know that. You saw him, Bro.
Trial court: Mr. Monreal.
Appellant: You saw it, Dawg. You saw it with your own eyes. You saw it, Bro. You saw who shoot [sic] him. You know I didn't shoot him. You know that shit.
The Bailiff: Stop moving.
Appellant: With your eyes, Johnny. How can it be different, Bro? You saw him. I just can't be quiet about it.
(Defendant was removed out of courtroom)
Trial court: All right ladies and gentlemen, please disregard Mr. Monreal's statements. You may proceed.
Before defense counsel could continue his cross-examination, Sanchez asked for a break, and the trial court excused the jury. The following conversation between the court and the attorneys then occurred on the record:
Trial court: ... Mr. Cortes, before we went on break I asked you if you wanted your client brought back out. I can have the deputy admonish and we can bring him back out or if you feel it's better for him not to be present.
Mr. Cortes: I do believe that he is so passionate about this, Your Honor, that it would simply be a continuation of this and it would just delay this and it may prejudice him in front of the jury and I would not want that to occur. I have no further questions of Mr. Sanchez.
*733 In his final issue on appeal, appellant does not contend his behavior did not warrant his removal from the courtroom. Instead, his argument focuses on the fact that he was not allowed to return to the courtroom. We review a trial court's decision to exclude a criminal defendant from trial for an abuse of discretion. See Kessel v. State , 161 S.W.3d 40, 44 (Tex. App.-Houston [14th Dist.] 2004, pet. ref'd) ; see also Illinois v. Allen , 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (courts must be given sufficient discretion to determine the appropriate manner of handling a disruptive defendant in the courtroom). We will uphold the trial court's ruling so long as it is "within the zone of reasonable disagreement." Kessel , 161 S.W.3d at 44.
Both the United States Constitution and the Texas Constitution require any defendant threatened with the loss of liberty to be physically present at all phases of the criminal proceedings against him. Allen , 397 U.S. at 338, 90 S.Ct. 1057 ; TEX. CONST. art. I, § 10 ; see also Sanchez v. State , 702 S.W.2d 258, 259 (Tex. App.-Dallas 1985, pet. ref'd) (criminal defendant has a fundamental right be present at every stage of his trial). However, a court may, in its discretion, find it necessary to remove a defendant from the courtroom for acting in a disruptive, obstreperous, or contemptuous manner. Allen , 397 U.S. at 343-44, 90 S.Ct. 1057. Recognizing the need for flexibility in dealing with such defendants, the Allen Court held a trial court may deal with a disruptive defendant in at least "three constitutionally permissible ways": (1) allow the defendant to remain in the courtroom, but have the defendant bound and gagged; (2) cite the defendant for contempt, which could require the court to discontinue the trial and imprison the defendant until such time as the defendant promises to behave himself; or (3) remove the defendant from the courtroom "until he promises to conduct himself properly." Id. at 344-45, 90 S.Ct. 1057.
We hold the trial court did not abuse its discretion in removing appellant from the courtroom because appellant acted in "a disruptive, obstreperous, or contemptuous manner." See Ramirez v. State , 76 S.W.3d 121, 129-30 (Tex. App.-Houston [14th Dist.] 2002, pet. ref'd) ("Here, the record reflects that appellant's counsel expressly stated he had no objection to excluding appellant from the courtroom. Where both the trial judge and appellant's counsel agree that appellant should be removed from the courtroom, we presume appellant's tone, volume, or demeanor must have been highly disruptive. ... As the trial court lacked reason to believe appellant's misbehavior would cease, appellant's expulsion was not constitutionally improper.").
We also conclude that appellant's not returning to the courtroom was not due to any error on the trial court's part. After appellant was removed, the trial court asked defense counsel if he wanted appellant brought back into the courtroom, and the court offered to have the deputy admonish appellant. This indicates the trial court attempted to deal with appellant in a "constitutionally permissible way" by removing appellant from the courtroom "until he promises to conduct himself properly." See Allen , 397 U.S. at 343-44, 90 S.Ct. 1057.
Also, it was not the trial court that determined appellant should not return to the courtroom. That decision was made by defense counsel on appellant's behalf because counsel believed appellant was "so passionate about this," and "it would simply be a continuation of this and it would just delay this and it may prejudice him in front of the jury." The right to be present in the courtroom "must be implemented by the judicial system unless expressly *734 waived." See Kessel , 161 S.W.3d at 44 n.1 ; see also Hill v. State , No. 2-06-094-CR, 2007 WL 866476, at *8 (Tex. App.-Fort Worth Mar. 22, 2007, pet. ref'd) ("Here, the trial court agreed to Appellant's trial counsel's request that the record reflect that Appellant had decided to voluntarily absent himself from trial [by intentionally ingesting drugs he purchased from other inmates], implicitly finding that Appellant's absence was voluntary."). We conclude defense counsel "expressly waived" appellant's right to return to the courtroom.
CONCLUSION
We overrule appellant's issues on appeal and affirm the trial court's judgment.

Appellant also contends trial counsel should have retained a gunshot residue expert and requested a continuance. Appellant does not elaborate on these complaints; therefore, these complaints are not preserved for our review on appeal.

The State, which filed its appellate brief after Weaver issued, cited extensively to Weaver .

We recognize the procedural posture of Weaver -a post-conviction collateral attack on the judgment-is different from this case in which appellant raises his ineffective-assistance complaint on direct appeal. We also acknowledge that Weaver itself recognized the difference. Id. at 1912 ("When an ineffective-assistance-of-counsel claim is raised in postconviction proceedings, the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases. The finality interest is more at risk, ... and direct review often has given at least one opportunity for an appellate review of trial proceedings. These differences justify a different standard for evaluating a structural error depending on whether it is raised on direct review or raised instead in a claim alleging ineffective assistance of counsel."). However, Weaver also recognized two other considerations for a different standard. The Court noted that, "[w]hen a defendant first raises the closure in an ineffective-assistance claim, ... the trial court is deprived of the chance to cure the violation either by opening the courtroom or by explaining the reasons for closure. Furthermore, when state or federal courts adjudicate errors objected to during trial and then raised on direct review, the systemic costs of remedying the error are diminished to some extent." Id. Finally, the Court noted, " '[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial,' thus undermining the finality of jury verdicts." Id. (citation omitted). Therefore, despite the difference in procedural posture, we apply Weaver .

Although the recordings were not admitted into evidence at the new trial hearing, the trial court allowed the recordings to be submitted for bill of review purposes. Therefore, the recordings are part of the appellate record for purposes of appeal and we may consider their contents in determining whether the trial court erred.

We note parole was addressed in the punishment jury charge, which stated:
Under the applicable law in this case, it is possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.
Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or thirty years, whichever is less. Eligibility for parole does not guarantee that parole will be granted.
It cannot accurately be predicted how the parole law might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.
You may consider the existence of the parole law. However, you are not to consider the manner in which the parole law may be applied to this particular defendant.
You are not to discuss among yourselves how long the defendant would be required to serve the sentence that you impose. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice and the Governor of Texas, and must not be considered by you.

Rule of Evidence 606(b) concerning juror testimony was amended after the Sneed decision, and several courts of appeals have suggested Sneed is no longer viable in light of the amended rule. See Davis v. State , 119 S.W.3d 359, 365 (Tex. App.-Waco 2003, pet. ref'd) ; Hart v. State , 15 S.W.3d 117, 123 (Tex. App.-Texarkana 2000, pet. ref'd) ; Hicks v. State , 15 S.W.3d 626, 630 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). The Texas Court of Criminal Appeals, however, has yet to decide the issue. Salazar , 38 S.W.3d at 147 n.3 (a Rule 606(b) objection would seem to preclude use of the Sneed test, but declining to address the issue as waived). Here, the State raised a Rule 606 objection to the testimony of the two jurors, however, the trial court allowed defense counsel to question the jurors under Sneed . Therefore, in this appeal, we also consider whether appellant satisfied the Sneed test.