In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00239-CR
_____

**ALLEN JAMES HANCOCK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. 13-18338**
_____

**MEMORANDUM OPINION**

Allen James Hancock appeals his conviction for capital murder. In one issue,

he argues the evidence admitted in his trial fails to support the jury's verdict finding

him guilty. After considering his arguments, we affirm the judgment but reform it to

correct a clerical error that it contains. As reformed, the final judgment is affirmed.

1

Background

One night in late-June 2013, several people, including MacGarrett Jack, Preston Wilson, and Joshua Caesar, were at Jack's home with others, some of whom were playing dominoes. While there, one or more individuals, with guns, approached Jack's carport and announced to the group they were being robbed. The testimony in the trial shows that Jack, who was at a table playing dominoes, bolted toward the door to his home. Gunshots were then fired toward the group. During the robbery, Jack, Wilson, and Caesar[1] were struck by bullets, which proved fatal. The pathologist who examined Jack's, Wilson's, and Ceasar's bodies determined that they died from the gunshot wounds they suffered after being shot at Jack's home.

In December 2013, the State filed an indictment alleging that Hancock murdered Jack and Wilson during the same criminal transaction.[2] The case against Hancock went to trial in June 2017. During the trial, the State called three men, Sam

[1] The indictment names Hancock as the person who shot Jack and Wilson.

[2] *See* Tex. Penal Code Ann. § 19.03(a)(7)(A) (West 2019). We cite the current version of any statutes referenced in the appeal since the amendments to them, if any, have not affected our resolution of the issues Hancock has raised in his appeal.

Brown,[3] Arthur Smith,[4] and William Lee,[5] who were among the men with Jack at his home the night the shooting occurred. Lee testified in the trial, and his testimony reflects that he was seriously wounded by the gunfire that night. According to Lee, he remembered a gunman wearing a camouflage bandana as the man approached Jack's home. Lee testified that he saw the gunman's bandana fall from his face, allowing Lee to briefly view the man's face. Lee agreed that when the gunshots rang out, he dove for cover, so he did not see anyone firing a gun. The bullets that struck Lee resulted in him losing sight in his left eye.

When Brown testified in the trial, he stated he saw "three to four" African-American individuals in black clothes wearing camouflage bandanas over their faces as they approached Jack's home. Brown explained he could not see the men's faces, that no one ever showed him any pictures of the men, and that he could not recognize anyone in the group should he see them again. Smith's testimony differs from Brown's only with respect to the fact Smith saw only one man approach Jack's

---

[3] We identify the individuals who were present but who were not killed during the robbery with pseudonyms. *See* Tex. Const. art. I, § 30(a)(1) (granting victims of crimes "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[4] A pseudonym.

[5] A pseudonym.

3

home. Smith described that man as an African-American male with a camouflage bandana covering his face. Smith agreed that he could not identify that man.

The evidence established that Lee went to the hospital where he was treated for his injuries after the shooting occurred. Shortly after Lee came out of surgery, the police came to the hospital and showed Lee six photos, including Hancock's, the only suspect included in the group of photographs Lee viewed at the hospital. Lee testified that he could not identify anyone from the six photos he examined while hospitalized because he was medicated, recovering from surgery, and had lost sight in his left eye.

Lee then testified that in mid-July 2013, he was watching television when he saw a news report about a person the police arrested. While the arrest mentioned in the newscast did not involve the shootings at Jack's home, the broadcast mentioned that police wanted to talk to Hancock about the triple-homicide that occurred in June 2013. Lee agreed that he saw a photograph of Hancock during the newscast. Lee called the police the next day and asked them to come to his home. When the police responded to Lee's request, they showed him the same photos they showed him at the hospital. But on this occasion, Lee identified Hancock as the person he saw holding a gun at Jack's home. Lee testified that when he saw Hancock's image on television, he immediately recognized Hancock's image as the person who he saw

4

holding a gun the night someone shot him. According to Lee, the broadcast caused him to "flashback" to the night of the shooting. Lee explained that he was 100% certain that Hancock is the person he saw with a gun that night. Lee also identified Hancock as he sat by defense counsel as the person he saw that night.[6]

Several employees of the Beaumont Police Department testified about the investigation the police conducted into the murders. Officer Heather Wilson was one of the officers who went to the scene the night the robbery occurred. She was one of nineteen witnesses the State called during the trial. According to Officer Wilson, upon arriving at Jack's home, she learned from another officer that a collision involving two vehicles occurred that same night on a street near Jack's home. When Officer Wilson went to the scene of that collision, she found a white truck in an intersection located about two blocks from Jack's home. Near the truck, Officer Wilson found debris in the road from another vehicle that was no longer at the scene, including parts from a mirror and pieces of plastic. The police took photographs of that scene and collected the debris around the white truck as part of their investigation into the murders at Jack's home.

---

[6] Hancock's counsel did not file any pretrial motions or make any objections during the trial to Lee's testimony about his out-of-court or in-court identifications of Hancock as the gunman he saw at Jack's home.

Officer Michael Roberts is another officer who testified in Hancock's trial. Officer Roberts was investigating another reported hit-and-run collision in another part of Beaumont the night the three men were murdered at Jack's home. According to Officer Roberts, Latrina Hall reported an alleged hit-and-run accident involving her black SUV that night, which she claimed occurred on a street in Beaumont that is several miles from the scene of the murders. Officer Roberts spoke to Hall and went to her mother's home to inspect the damages associated with Hall's report of the hit-and-run collision. Officer Roberts testified that Hall told him a white or silver colored truck sideswiped the passenger side of her black SUV while she was driving the SUV. Hall could not provide Officer Roberts with any further description about the truck. Later that same night, Officer Roberts learned from one of the officers involved in the murder investigation that a witness claimed to have seen a dark-colored SUV speeding away after hearing gunshots in her neighborhood. Officer Roberts called Hall to question her further about the circumstances involving her report. When he reached her by phone, she told him that she was at her apartment in Port Arthur. At that point, Officer Roberts relayed the information Hall gave him to the detectives involved in investigating the murders.

Several witnesses testified to circumstances that allowed the jury to connect Hall's SUV to the SUV involved in the collision that occurred near Jack's home. For

6

example, Jenny Lounsbury, a forensic scientist employed by the Texas Department of Public Safety, explained that she compared the mirror assembly found near the white truck to a part taken by police from Hall's SUV. According to Lounsbury, the mirror assembly matched Hall's SUV. While holding pieces from the scene and from Hall's SUV, Lounsbury testified that "at one time, these two items were joined together similar to putting back a piece of the puzzle." And Lounsbury explained that other pieces of debris found at the scene near Jack's home were "consistent with" the color and type of plastic used in manufacturing Hall's SUV. Nonetheless, Lounsbury also stated that many pieces of the debris taken from the scene near the white truck did not belong to Hall's SUV.

Hall's testimony also provides support to the jury's conclusion that Hancock had Hall's SUV the night of the murders. During Hall's testimony, Hall agreed that she also faced charges for the murders. Nonetheless, Hall denied she was involved in the crimes at Jack's home. According to Hall, the night of the shootings, she was working as a nurse's assistant at a local nursing home. Police confirmed that part of her story. Hall also explained that Hancock dropped her off at work during the afternoon, which was before the men were murdered. She stated that Hancock then drove away in her black SUV. Hall acknowledged that she and Hancock were dating at that time, and she testified that she regularly allowed Hancock to use her car. Hall

7

explained that while she was working her shift, she saw a television broadcast reporting a triple homicide and advising that the police were looking for a black SUV that someone saw leaving the scene.

During her testimony, Hall explained that Hancock picked her up when her shift ended that night, but that he was not driving her SUV. According to Hall, Hancock told her he had backed her car into a pole. When Hancock took Hall to her SUV, she noticed the passenger-side window and mirror were missing from her car. According to Hall, her SUV was not damaged when Hancock dropped her off at work. Hall testified that, to support an insurance claim, she decided to report the SUV had been in a hit-and-run accident in a location that she picked without knowing anything about Hancock's involvement in the murders at Jack's home.

Over the next few weeks, Hall acknowledged that she gave officers in the murder investigation at least five inconsistent accounts about who had been driving her SUV the night the murders occurred. Hall blamed Hancock for the decisions she made to lie to the police about what happened to her SUV. According to Hall, Hancock told her to tell the police that a man named "Mike C" was the person driving her car after he dropped her off at work. On cross-examination, Hall agreed she lied to the police about the person she allowed to use her SUV at least twice the first night she spoke to the police, and she agreed she continued to lie to police for

over a month when they questioned her about who was driving her car. For instance, when first questioned at the police station about the murders, Hall admitted she fabricated the story about someone sideswiping her SUV.

Late that summer, the police charged Hall with murder, arrested her, and placed her in jail. On August 8, 2013, Hall spoke to detectives again about the shootings at Jack's home. While Hall maintained she was not involved, she told police that she and Hancock were dating and that Hancock had her SUV the evening the murders occurred. During her testimony, Hall stated that Hancock told her to lie to the police about who had her car the night the murders occurred. Hall agreed that she was still facing charges alleging she committed capital murder. Yet Hall told the jury she did not have any agreement with the State regarding the murder charges and was testifying against Hancock because she wanted to help "the victim's family."

The investigation the police conducted into the shootings included examining some of the exterior windows on Jack's home and examining Hall's SUV. This part of the investigation included examining those items for biological evidence. Angelica Hernandez, a crime scene technician employed by the Beaumont Police Department, testified that when she examined the SUV for fingerprints, Hancock's fingerprints were not in Hall's SUV. Hernandez also examined some of the windows outside Jack's home but found no fingerprints on them.

9

While numerous other witnesses testified in the trial, we do not discuss their testimonies because we have focused on the testimony that Hancock challenges directly in his argument claiming the jury did not have enough evidence to tie him to the murders.

Sufficiency Challenge

Hancock argues he is entitled to an acquittal because the evidence in his trial fails to prove, beyond a reasonable doubt, that he is the person who Lee saw holding a gun at Jack's home or to show that he was a party to the shootings. According to Hancock, the State failed to provide the jury with enough evidence to prove him guilty of murdering Jack and Wilson. Hancock suggests that the jury could not have reasonably relied on Lee 's testimony that Hancock was the person Lee saw holding a gun given that Lee failed to pick Hancock out of the photo array the first time the police asked him if he could identify anyone involved in the shootings. Hancock also suggests the evidence shows that Lee's memory about the person he saw the night the shootings occurred was based on the newscast he viewed in mid-July 2013. Hancock also suggests that the absence of physical evidence tying him to the shootings indicates the State failed to meet its burden of proof. He contends that even if the jury could have reasonably credited the testimony given by Lee and Hall, their testimony does not "connect [him] with the actual shooting[.]" Hancock askes

that this Court "sit as a thirteenth juror and disagree with [the] jury's resolution of [the] conflicting or non[-]existing evidence" the jury considered during his trial. Hancock concludes that except for "what appears to be the tainted identification made by [Lee], there is no evidence or testimony that directly connects" him "with the murders."

## Standard of Review

To convict a person of capital murder, the State must prove the person committed murder together with one of the aggravating factors listed in the statute that defines capital murder.[7] Here, the State charged Hancock with committing capital murder, alleging he intentionally or knowingly caused the deaths of Jack and Wilson during the same criminal transaction.[8] That said, under the law of parties, a defendant is criminally responsible not only for his acts but those of others whose criminal acts can be attributed to him.[9]

---

[7] Tex. Penal Code Ann. § 19.03(a) (West 2019); *see also id.* § 19.02(b)(1) (West 2019) (explaining murder occurs when a person intentionally or knowingly causes the death of another).

[8] *See id.* § 19.03(a)(7)(A) (murdering more than one person during the same criminal transaction).

[9] *Id.* § 7.01 (West 2011).

The Due Process Clause requires a defendant's conviction to be supported by legally sufficient evidence to prove he committed the crime.[10] In assessing whether a defendant's conviction is supported by sufficient evidence, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt."[11]

The standard of review that applies in a criminal case "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence."[12] In our review, we determine "whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of all of the evidence."[13] Thus, we presume the factfinder resolved any conflicting inferences from the evidence in a way that favors upholding the jury's verdict.[14] In our review, we may not reevaluate the weight and credibility

---

[10] U.S. CONST. amend. XIV; *See Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979); B*rooks v. State*, 323 S.W.3d 893, 917 (Tex. Crim. App. 2010).

[11] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318-19); *see also Brooks*, 323 S.W.3d at 902.

[12] *See Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).

[13] *Id.; Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012).

of the evidence in the record and then substitute our own judgment for the one made by the factfinder.[15] Instead, we must "defer to the jury's credibility and weight determinations[.]"[16] And while "the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.'"[17] Still, juries are not allowed to arrive at a verdict based on "mere speculation or factually unsupported inferences or presumptions."[18] On the other hand, the State is not required to produce direct evidence to prove its case because the law does not require each fact admitted into evidence to "point directly and

---

[14] *Brooks*, 323 S.W.3d at 922; *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[15] *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see Brooks*, 323 S.W.3d at 899 (reviewing court must not sit as "thirteenth juror," disagree with the weight the jury gave to the evidence or "disagree [ ] with a jury's resolution of conflicting evidence") (citations omitted).

[16] *Brooks*, 323 S.W.3d at 899; *see also Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012) (reviewing court must not usurp the jury's role by "substituting its own judgment for that of the jury").

[17] *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

[18] *Hooper*, 214 S.W.3d at 15-16 (explaining that speculation is "theorizing or guessing about the possible meaning of facts and evidence presented").

independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."[19]

Analysis

At the outset, we observe that Hancock's counsel was able to fully explore the credibility of each witness and whether each had a motive to lie during the trial. As the trier of fact, the jurors were the sole judges of the credibility of the testimony admitted in the trial and of its weight.[20] Thus, the jury was free to believe all, some, or none of each witness's testimony.[21] In our review, "[w]e may not re-weigh the evidence or substitute our judgment for that of the factfinder."[22] During the trial, Lee explained the reasons for any discrepancies in his testimony and the jury could have reasonably credited his explanation about why he failed to identify Hancock's photograph the first time he saw it. Further, Lee explained, and the jury could reasonably accept, Lee's account that he could not recall Hancock's image the first time he saw it because he was medicated and still recovering from surgery.

---

[19] *Id.* at 13.

[20] *See Adames*, 353 S.W.3d at 860.

[21] *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008); *Monreal v. State*, 546 S.W.3d 718, 724 (Tex. App.—San Antonio 2018, pet. ref'd).

[22] *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018).

Additionally, Lee testified he remembered seeing Hancock's face from the recollection he had about the events at Jack's home and that his recollection was not based on what he saw on television.[23] As the entity given the right to judge Lee's credibility, the jury could have reasonably found Lee's testimony credible.

The standard of review also requires this Court to defer to the jury's resolution over whether Hall testified truthfully in the trial.[24] Hancock complains that Hall's testimony is not reliable, but the jury chose to find otherwise. Its conclusion, on this record, was not unreasonable. For instance, the jury was entitled to conclude that Hall lied to police to protect Hancock but later changed her mind and testified truthfully in the trial.

In Hancock's case, there is additional circumstantial evidence that allowed the jury to conclude that Hancock was a party to the murders at Jack's home. For example, Hall testified that Hancock told her to lie to police about who had her car the night the murders occurred. Under the circumstances proven in the trial, the jury

---

[23] *Gilmore v. State*, 397 S.W.3d 226, 240-41 (Tex. App.—Fort Worth 2012, pet. ref'd) (affirming conviction where witness positively identified defendant during trial but, while recovering in the hospital, identified defendant while watching a television news report of the crime despite not previously being able to identify defendant from a photographic line-up; rather, identifying another person from the line-up).

[24] *See Brooks*, 323 S.W.3d at 899.

15

could have reasonably believed this testimony. And when defendants ask others to give the police false information relevant to an official investigation into a crime, the jury can infer they know they are guilty.[25]

In part, Hancock's arguments focus on the lack of fingerprints, DNA, and clothing that, had such items been located, could have tied Hancock to Hall's SUV or the scene of the crime. But, the absence of such evidence does not exclude Hancock from the group of people who might have had Hall's car or been at Jack's home.[26]

Hancock also argues that because no witnesses testified that they saw him fire a gun, he could not be found guilty of capital murder. But under the charge the court

---

[25] *See Jackson*, 443 U.S. 318-310 (explaining that the reviewing court must give deference to the jury's responsibility to draw reasonable inferences from the testimony to decide the ultimate facts); *see Fountain v. State*, 401 S.W.3d 344, 358 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (explaining a defendant's conduct in making up false statements to cover up the commission of a crime, as well as enlisted others in defendant's attempts to lie, indicate consciousness of guilt to prove commission of the offense); *see also Garza v. State*, 358 S.W.2d 622, 623 (Tex. Crim. App. 1962) (explaining that efforts of an accused to induce a witness to testify falsely may be shown as indicating a consciousness of guilt).

[26] *See*, *e.g.*, *Rivera v. State*, 89 S.W.3d 55, 60 (Tex. Crim. App. 2002) (instructing that the absence of DNA does not indicate innocence when such evidence may not have ever existed); *see also Holberg v. State*, 425 S.W.3d 282, 287-88 (Tex. Crim. App. 2014) (explaining exculpatory evidence does not necessarily negate other inculpatory evidence).

gave the jury in Hancock's case, the jury was entitled to find Hancock guilty as a party to the shootings. As a party, the State did not need to prove that it was Hancock's gun that inflicted any of the fatal wounds.[27]

We conclude the combined and cumulative force of the evidence allowed the jury to find, beyond a reasonable doubt, that Hancock was guilty of capital murder. We overrule Hancock's sole issue and affirm the jury's verdict.

## Reformation of Judgment

While the jury's verdict is affirmed, a clerical error exists in the trial court's judgment in Cause Number 13-18338. While neither party pointed out the error in their briefs, the record shows that Hancock was indicted and convicted under section 19.03(a)(7)(A) of the Penal Code, not section 19.03(a)(6)(A) as the judgment recites.[28]

---

[27] *See Cordova v. State*, 698 S.W.2d 107, 111-12 (Tex. Crim. App. 1985) (holding the evidence sufficient to establish party liability for a homicide when the defendant was part of a group of people that "simultaneously and jointly attacked" the victim, even though the defendant himself did not inflict the mortal wound to the victim); *Harmon v. State*, No. 09-16-00304-CR, 2018 Tex. App. LEXIS 7818 (Tex. App.—Beaumont Sept. 26, 2018, pet. ref'd) (mem. op., not designated for publication) (affirming defendant's murder conviction based on sufficient evidence establishing defendant's actions causing the victim's death; or, in the alternative, defendant's participation as a party to the offense that contributed to the victim's death).

[28] *Compare* Tex. Penal Code Ann. § 19.03(a)(6)(A) (West 2019) (defining the manner that capital murder may be committed as murdering another while

17

We have the authority to reform the trial court's judgment to make the record speak the truth.[29] We may act *sua sponte* to reform an incorrect judgment, and we may have a duty to do so.[30] To correct the clerical error that exists in the judgment, we reform the judgment by deleting the language that Hancock was convicted under section "19.03(a)(6)(A) PC" and replace that reference with the number "19.03(a)(7)(A) PC." As a result, the judgment, as reformed, reflects the provision in the Penal Code on which the judgment is based.

Having overruled Hancock's issue, the judgment as reformed is affirmed.

AFFIRMED AS REFORMED.

_____
HOLLIS HORTON
Justice

Submitted on September 12, 2018
Opinion Delivered May 29, 2019
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.

_____

incarcerated for capital murder), *with id*. § 19.03(a)(7)(A) (defining the manner capital murder may be committed as murdering more than one person in the same criminal transaction).

[29] *See* Tex. R. App. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992).

[30] *French*, 830 S.W.2d at 609; *Asberry v. State*, 813 S.W.2d 526, 530 (Tex. App.—Dallas 1991, pet ref'd).

18